IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LEON WEINGRAD**, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. 1:26-cv-10197 |
| *v.* | |
| **EVERQUOTE, INC.**, | |
| *Defendant.* | |

**DEFENDANT EVERQUOTE, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION**

**I.    INTRODUCTION**

This case has no business being in federal court. Plaintiff's claims belong in mandatory, individual arbitration before the American Arbitration Association ("AAA"), not in litigation, and certainly not on a classwide basis.

Plaintiff alleges that he received unsolicited telemarketing calls from EverQuote in January 2026 in alleged violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. However, without admitting that any statutory violation occurred, EverQuote's system could only have obtained Plaintiff's telephone number and initiated these calls because a user visited auto.everquote.com (the "Website")—a property owned and operated by EverQuote—and affirmatively requested auto insurance quotes by entering personal information and clicking a button expressly agreeing to the Website's Terms of Use. *See* Declaration of Madeline Contois ("Contois Decl.") (attached to this filing as Exhibit A); *see also* Exhibit B (Terms of Use).

EverQuote's internal business records definitively establish that on January 14, 2026, a request for insurance quotes was submitted on the Website. Because the Website is owned and operated by EverQuote, this submission was securely captured and maintained directly in

EverQuote's internal databases in the regular course of business. And this submission includes Plaintiff's exact telephone number ending in 7476.

By submitting this data, the user was put on clear, inquiry notice of EverQuote's conspicuously displayed and hyperlinked Terms of Use. To complete the transaction, the user had to click a prominent orange button labeled "Get My Quotes," directly below which sat an unambiguous clickwrap disclosure. That disclosure explicitly informed Plaintiff: "By clicking Get My Quotes and submitting this form... I affirm that I have read and agree to this website's Privacy Policy and Terms of Use, including the arbitration provision and the E-SIGN Consent."

Plaintiff may attempt to deny visiting the Website or submitting this information, but that factual dispute is legally irrelevant for this Court's purposes. The Terms of Use contain a broad, mandatory Arbitration Agreement governed by the Federal Arbitration Act ("FAA") that covers all claims based in contract, tort, or statute. The Agreement contains an airtight delegation clause that completely strips this Court of the authority to decide threshold questions, expressly mandating that: "All issues are for the arbitrator to decide, including, without limitation, issues relating to the applicability and enforceability of this arbitration agreement."

Furthermore, the Terms feature a strict Class Action Waiver. It dictates that "THE ARBITRATOR MAY NOT CONSOLIDATE, COMBINE, OR JOIN THE CLAIMS OF OTHER PARTIES WHO MAY BE SIMILARLY SITUATED OR OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING." Consequently, Plaintiff forfeited his right to participate in a class action and to a jury trial the moment this request was submitted on the Website.

Because Plaintiff's claims are based entirely on calls arising directly from a submission on EverQuote's owned and operated Website, this dispute falls squarely within the scope of the Arbitration Agreement. This Court's role is strictly limited to enforcing the delegation clause,

compelling Plaintiff to submit his claims to individual arbitration, and dismissing or staying this action. Under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, EverQuote respectfully moves to compel arbitration and dismiss this case.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff Completed An Online Form And Accepted The Terms Of Use By Clicking "Get My Quotes."

On January 14, 2026, a user visited the Website, which is owned and operated by EverQuote. Contois Decl. at ¶¶ 6, 9. Because the Website is an owned and operated property of EverQuote, user submissions, along with metadata like the date, time, and IP address, are securely captured and maintained directly within EverQuote's internal databases in the regular course of business. *Id*. at ¶¶ 6-8.

While on the Website on January 14, 2026, Plaintiff entered identifying information into the online form, including the email address "sosking24@gmail.com" and Plaintiff's exact phone number ending in 7476. *Id*. at ¶ 10. To complete the transaction, Plaintiff was required to click a prominent orange button labeled "Get My Quotes." *Id*. at ¶ 13. Located directly below this button was a clear, unambiguous disclosure. *Id*. at ¶ 11. By proceeding, Plaintiff accepted the following explicit terms:

> By clicking Get My Quotes and submitting this form, I am providing express written consent to being contacted by you, EverQuote Marketing Partners, or by one or more agents or brokers of your partners which companies I agree may reach me to discuss my interest, including offers of insurance, at the phone number and/or email address I have provided to you in submitting this form and/or additional information obtained. I consent by electronic signature to being contacted by telephone (via call and/or text) for marketing/telemarketing purposes at the phone number I provided in this form, even if my phone number is listed on a Do Not Call Registry, and I agree that such contact may be made using an automatic telephone dialing system and/or an artificial or prerecorded voice (standard call, text message, and data rates apply). I can revoke my consent at any time. I also understand that my agreement to be contacted is not a condition of purchasing any property, goods or services, and that I may call 1-855-840-1737 to speak with someone about obtaining an insurance quote.By clickingGet My Quotes and submitting this form, I affirm that I have read and agree to this website's Privacy Policy and Terms of Use,including the arbitration provision and the E-SIGN Consent.

*Id.* at ¶¶ 11, 14. This disclosure clearly states that by clicking the "Get My Quotes" button, the user agrees to the Website's Terms of Use, which explicitly includes binding arbitration. *Id.* at ¶¶ 10, 13-15. EverQuote's Privacy Policy, Terms of Use, and E-SIGN Consent are hyperlinked in underlined text within the disclosure. *Id.* at ¶ 16.

**B.      EverQuote's Arbitration Agreement Applies To Any And All Claims Between Plaintiff And EverQuote.**

The linked Terms of Use that Plaintiff accepted contain a mandatory, binding Arbitration Agreement and Class Action Waiver. *Id.* at ¶ 19. Specifically, Section 2 of the Terms states in relevant part:

**2. Dispute Resolution By Binding Arbitration**

**PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.** You agree to attempt in good faith to settle any dispute or claim that has or may arise between us, which arises out of or relates in any way to these Terms or your use of the Site or the Content, including, without limitation, any dispute or claim between you and a Provider (each, a "Claim"), by way of consultations between you and us, which consultations will be initiated upon written notice by any party to the other (the "Consultation Notice"). The Consultation Notice must describe the nature and basis of the Claim and set forth the specific relief sought ("Demand"). If such Claim cannot be resolved within thirty (30) days after the Consultation Notice is received, any party to the consultations may initiate an arbitration proceeding upon written notice to the other party in accordance with this Section 2. Any notice to us under this Section 2 should be addressed to: **compliance@everquote.com** ("Notice Address").**You agree to arbitrate all Claims between you and us, or any Provider, that cannot be amicably resolved in accordance with the foregoing paragraph.** This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to: (a) claims arising out of or relating to any aspect of your relationship with us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; and (b) claims that could be alleged as class action Claims (and you agree to waive the right to participate in a class action in accordance with this Section 2). For the avoidance of doubt, references in this Section 2 to "Site operator," "Provider," "we", "Prospect", "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors and assigns, as well as all authorized or unauthorized users or beneficiaries of the services, information or Site Content available through the use the Site. This arbitration agreement does not preclude you from bringing an individual action in small claims court if your claims qualify, and so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis. Further, this arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission or the Federal Trade

Commission. You agree that, by entering into this arbitration agreement, you and we are each waiving our respective rights to a trial by jury or to participate in a class or representative action, and that arbitration of disputes pursuant to this Section 2 shall be in your individual capacity. THIS MEANS YOU ARE LIMITING YOUR RIGHT TO APPEAL AND ARE WAIVING YOUR RIGHTS TO OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS A COURT ACTION. You acknowledge and agree that the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

The arbitration will be governed by the American Arbitration Association ("AAA") under its then-prevailing rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (collectively, the "AAA Rules"), as modified by this Agreement (but expressly excluding the Supplementary Rules for Class Arbitration and any other AAA Rules that conflict with the waiver of class arbitration and representative proceedings below), and will be administered by one (1) arbitrator with relevant industry experience appointed in accordance with the AAA Rules. The AAA Rules are available at **https://www.adr.org/Rules** or by calling (800) 778-7879. The arbitrator is bound by the terms of this Agreement and shall apply Delaware law consistent with the Federal Arbitration Act and applicable statutes of limitations, and shall honor claims of privilege recognized at law. All issues are for the arbitrator to decide, including, without limitation, issues relating to the applicability and enforceability of this arbitration agreement.

Unless otherwise mutually agreed by the parties to the arbitration, any arbitration hearings under this Section 2 will take place in the county where you are domiciled. If your Claim is for $5,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your Claim exceeds $5,000, the right to a hearing will be determined by the AAA Rules. Except as otherwise provided for in this Section 2, in any arbitration between you and us under this Section 2, all AAA filing, administration and arbitrator fees for any arbitration initiated in accordance with the notice requirements above where Claims for damages do not exceed $10,000 shall, at your written request, be paid by us. Any request for payment of fees by us shall be submitted by mail to the AAA along with your demand for arbitration, and we will make arrangements to pay all necessary fees directly to the AAA. If the value of the relief sought is more than $10,000 and you are able to demonstrate that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the filing, administration and arbitrator fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. If, however, the arbitrator finds that either the substance of your Claim or the relief sought in the Demand is frivolous or brought for an improper purpose, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules.

The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. The arbitrator shall not be bound by rulings in prior arbitrations involving our other Users, but is bound by rulings in prior arbitrations involving the same User to the extent required by applicable law.

With the exception of the provision in the preceding paragraph prohibiting class arbitration or representative proceedings, if an arbitrator or court decides that any part of this Section 2 is invalid or unenforceable, the other parts of this Section 2 shall still apply to the maximum extent possible. In the event that the foregoing prohibition on class arbitration or representative proceedings is deemed invalid or unenforceable, then the entirety of this Section 2 shall be null and void. The remainder of the Terms, including, without limitation, Section 16 (Choice of Law and Forum), will remain in force.

You may opt-out of this arbitration provision only by written notice to us at the Notice Address (**compliance@everquote.com**) within thirty (30) days of your acceptance of this agreement, which notice shall include your name, address, and a clear statement that you do not wish to resolve disputes with us through arbitration.

If we make any change to this arbitration provision (other than a change to the Notice Address) during the term of your relationship with us, that change shall not apply to any Claim against us initiated prior to the effective date of the change. The change shall apply to all other Claims that have arisen or may arise between you and us. We will notify you of changes to this arbitration provision by posting the amended terms on the Site or by email, in each case at least thirty (30) days before the effective date of the changes.

Notwithstanding anything to the contrary in these Terms, Providers shall be third party beneficiaries of the rights to dispute resolution and arbitration set forth in this Section 2, and each Provider shall have the right to enforce this Section 2 against Users as if such Provider were a party to the agreement set forth in this Section 2 in the event of any dispute or claim between you and such Provider based on or relating to any transaction or interaction between you and such Provider that is enabled by or arises in connection with your use of the Site.

DO NOT USE THIS SITE IF YOU DO NOT AGREE TO THE FOREGOING BINDING ARBITRATION PROVISIONS.

*See* Exhibit B (emphasis added in original); Contois Decl. at ¶ 19. Accordingly, because Plaintiff accepted the Website's disclosure, he expressly agreed to submit his claims against EverQuote to arbitration, including the threshold issue of arbitrability.

Because Plaintiff entered his information on the Website and accepted the disclosure, he expressly agreed to be bound by the terms contained therein, including mandatory arbitration under the AAA rules.

Additionally, the Terms contain the following Class Action Waiver:

THE ARBITRATOR MAY NOT CONSOLIDATE, COMBINE, OR JOIN THE CLAIMS OF OTHER PARTIES WHO MAY BE SIMILARLY SITUATED OR OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING.

Exhibit B; Contois Decl. at ¶ 19-20. As such, Plaintiff forfeited his right to participate in a class action and to a jury trial when he submitted his request on the Website, thereby accepting EverQuote's Terms.

## C.    Plaintiff's Claims Arose Because He Provided His Consent On The Website.

In his Complaint, Plaintiff claims to have received allegedly unsolicited telemarketing calls to his cellular phone while it was registered on the National Do Not Call ("DNC") Registry. Complaint ("Compl.") at ¶¶ 15-19.

Without admitting any liability, the only way EverQuote could have obtained Plaintiff's telephone number is if he submitted a request for insurance quotes on the Website and explicitly consented to being contacted. Contois Decl. at ¶ 17. The disclosure Plaintiff accepted expressly authorized contact "by telephone (via call and/or text) for marketing/telemarketing purposes at the phone number [he] provided in this form, even if [his] phone number is listed on a Do Not Call Registry…" *Id.* at ¶¶ 11, 14.

Therefore, Plaintiff's claims regarding the telephone calls he allegedly received "arise[] out of or relate[] in any way to [the] Terms or [his] use of the Site," and therefore fall squarely within the broad scope of the Arbitration Agreement. *Id*. at ¶ 19; Exhibit B.

## III.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") codifies a strong federal policy in favor of enforcing arbitration agreements, including agreements to arbitrate statutory claims. *See* 9 U.S.C. § 2; *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1621 (2018) ("The [FAA], this Court has said, establishes 'a liberal federal policy favoring arbitration agreements.'"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24-25 (1991) (holding that FAA provisions demonstrate federal policy that favors

arbitration and its purpose was to reverse the longstanding judicial hostility to arbitration agreements); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (noting that the FAA's "principal purpose . . . is to ensure that private arbitration agreements are enforced according to their terms").

"[I]n Congress's judgment arbitration ha[s] more to offer than courts recognized – not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved." *Epic Systems*, 138 S. Ct. at 1621; *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) (noting that arbitration allows parties to resolve their claims for "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes"). Thus, "by agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26.

The FAA permits a party to move to compel arbitration when an opposing party refuses to arbitrate as required by a valid arbitration agreement. 9 U.S.C. §§ 3, 4. According to the Supreme Court, the FAA "leaves no place for the exercise of discretion by a [trial] court but instead mandates that [trial] courts *shall* direct the parties to proceed to arbitration" on all claims covered under the agreement. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

Any doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Courts, therefore, should "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Id.* at 22.

Principles of state contract law control whether a valid arbitration agreement exists. *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012). "When deciding whether the parties agreed to

arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

## IV.    ARGUMENT

### A.    Plaintiff's Claims Are Subject To Mandatory Arbitration.

The Arbitration Agreement Plaintiff entered is governed by the FAA. *See* Exhibit B; Contois Decl., at ¶ 19. The FAA requires district courts to compel arbitration of claims covered by an enforceable arbitration agreement. 9 U.S.C. § 3. Under the FAA, an agreement to arbitrate, like the one in EverQuote's Terms of Use that was linked in the disclosure Plaintiff accepted, "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Moses*, 460 U.S. at 24. The FAA reflects the "fundamental principle that arbitration is a matter of contract," and places arbitration agreements on "equal footing with other contracts." *AT&T*, 563 U.S. at 339 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). And because "arbitration is a matter of contract, courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 586 U.S. 63, 67 (2019) (quoting *Rent-A-Center,* 561 U.S. at 67).

Additionally, the Supreme Court has instructed courts to "'rigorously enforce' arbitration agreements according to their terms . . . including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes,'" . . . and 'the rules under which that arbitration will be conducted.'" *American Express Co. v. Italian Colors Restaurant,* 570 U.S. 228, 233 (2013) (citations omitted). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.,* 470 U.S. at  218. The Supreme Court has made clear that "parties may agree to have an arbitrator decide not only the merits of a particular

dispute but also ''gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein*, 586 U.S. at 67-68 (quoting *Rent-A-Center*, 561 U.S. at 68-69). "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id*. at 69. When considering whether there is a valid delegation, the court undertakes a limited inquiry into whether the parties clearly and unmistakably delegated the power to decide arbitrability to the arbitrator. *Id*. ("This Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence.") (citation omitted).

Here, Plaintiff entered into a valid contract with EverQuote that includes a mandatory arbitration provision. EverQuote has Terms of Use encompasses an enforceable Arbitration Agreement that Plaintiff voluntarily accepted. Exhibit 2; Contois Decl. at ¶¶ 18, 19. By expressly reserving all threshold issues of enforceability for the arbitrator, the Terms of Use divest this Court of the authority to adjudicate them. Accordingly, EverQuote respectfully requests that this Court enforce the agreement as written, compel Plaintiff to individual arbitration before the AAA, and dismiss this litigation.

### 1. Plaintiff Entered a Valid and Enforceable Arbitration Agreement with EverQuote.

In determining the validity of agreements to arbitrate which are subject to the FAA, courts generally apply ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc.*, 514 U.S. at 944 (" The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration.") (citation omitted). "The essential elements for the formation of a contract under Massachusetts law consist of an offer, acceptance, and consideration." *Bourque v. Rollins, Inc.*, 764 F. Supp. 3d 11, 15 (D. Mass. 2025) (quoting *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 89 (1st Cir.

2018)).

In Massachusetts, for a contract to be valid and enforceable, the parties must agree on the "material terms" and show a "present intention to be bound by that agreement." *Garg v. VHS Acquisition Subsidiary No. 7*, No. 4:20-CV-40060-TSH, 2021 WL 1873962, at *5 (D. Mass. Mar. 9, 2021) (not reported) (quoting *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000)). Under Massachusetts law, the test for contract formation hinges on reasonableness. *Pan v. Experian Info. Sols., Inc.*, No. 24-CV-12963-DJC, 2025 WL 2607941, at *4 (D. Mass. Sept. 9, 2025). Judges look at the specific circumstances, "focusing on whether the contract provisions at issue were reasonably communicated and accepted." *Id.* (quoting *Toth v. Everly Well, Inc.*, 118 F.4th 403, 410-11 (1st Cir. 2024)). Specifically, "the party against whom the contract is being enforced must have (1) received 'reasonable notice of the terms' and (2) 'reasonabl[y] manifest[ed] ... assent to those terms.'" *Id.*

Reasonable notice requires that a term be "conspicuous," meaning it is "so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it." *Cullinane*, 893 F.3d at 62 (quoting  Mass. Gen. Laws ch. 106, § 1-201(b)(10); Mass. Gen. Laws ch. 156 D, § 1.40 (defining the term "conspicuous" as "written so that a reasonable person against whom the writing is to operate should have noticed it")). "General characteristics that make a term conspicuous include using 'larger and contrasting font' or 'somehow setting off the term from the surrounding text by the use of symbols or other marks.'" *Id.* Whether the user actually reads the terms to which they assent is immaterial; in Massachusetts courts, it has long been the rule that "[t]ypically, one who signs a written agreement is bound by its terms whether [s]he reads and understands them or not." *Toth*, 118 F.4th at 411 (alterations in original) (citing *Good v. Uber Techs., Inc.*, 494 Mass. 116, 234 N.E.3d 262, 282 (2024) ("We do not require, for purposes of reasonable notice, that the user actually scroll through the terms.")).

Applying this test, "Massachusetts courts 'regularly enforce[ ]' so-called 'clickwrap' contracts." *Pan*, 2025 WL 2607941, at *4 (alterations in original) (quoting *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 574 (2021)). These agreements are considered the "'clearest manifestations of assent' because they require users to affirmatively signal their acceptance of the attached terms." *Toth*, 118 F.4th at 413.

Recently, federal courts applying Massachusetts law have consistently enforced clickwrap agreements in situations factually identical to this one. In *Toth*, the First Circuit affirmed the validity of an arbitration agreement where a consumer clicked a checkbox indicating they "have read and accept the Terms and Conditions." *Toth*, 118 F.4th at 407, 414. The court found that the language next to the checkbox properly "signify[ied] to users that they are entering into a contractual arrangement, and the terms themselves are linked," providing reasonable notice regardless of whether the user clicked the link to read them. *Id*. at 411. Similarly, in *Schwartz v. HelloFresh SE*, the District of Massachusetts enforced a clickwrap arbitration agreement against a plaintiff asserting TCPA claims based on a webform submission. *Schwartz v. HelloFresh SE*, No. 1:25-CV-12222-JEK, 2026 WL 161514, *1-2, 7 (D. Mass. Jan. 21, 2026). In *Schwartz*, the user clicked a toggle switch directly above text stating, "By checking the box above, I agree to Factor's Terms and Conditions." *Id*. at *1. The court determined that because the words "Terms and Conditions" were underlined and written in blue text—appearing as a clear hyperlink—the interface provided conspicuous, reasonable notice. *Id*. at *4. The court also found unambiguous assent because the connection between the user's action and the terms was direct. *Id*. at *5.

The Website—currently and at the time of Plaintiff's visit—utilizes a clickwrap agreement which provides users with clear, uniform notice of its binding terms and captures their affirmative assent before completing an internet transaction. Contois Decl. at ¶ 15. Similar to the interfaces enforced in *Schwartz* and *Toth*, the layout of the Website requires Plaintiff to signify his affirmative

acceptance of the disclosure containing the Terms of Use by clicking the "Get My Quotes" button. Contois Decl. at ¶¶ 11-13. The language next to the button indicates that the user must read and accept the terms and conditions, "signifying to users that they are entering into a contractual arrangement, and the terms themselves are linked." *Toth*, 118 F.4th at 411.

In fact, the "Terms of Use" within this disclosure were underlined and prominently highlighted in bright blue font, and the disclosure explicitly mentions the arbitration provision contained within the "Terms of Use." Contois Decl. at ¶ 15-16. This presentation easily satisfies the conspicuousness standard, as Massachusetts courts recognize that "'hyperlinks ... are commonly blue and underlined.'" *Cullinane*, 893 F.3d at 63; *see also Good*, 494 Mass. at 133. Just as the court in *Schwartz* held that blue, underlined hyperlinks placed directly next to a webform submission constitute reasonable notice of an arbitration agreement, EverQuote's disclosure achieves the exact same conspicuousness, going even further by explicitly referencing the arbitration provision on the face of the screen. Therefore, when Plaintiff affirmatively clicked the "Get My Quotes" button, forming a direct and unambiguous connection between his action and the terms, he agreed to the "Terms of Use"—including the binding and enforceable Arbitration Agreement contained in the "Terms of Use." Contois Decl. at ¶ 15.

### 2. The Arbitration Agreement Contains a Valid Delegation Clause.

Because "arbitration is a matter of contract," the "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68-69 (citation omitted). "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id*. at 70. Under First Circuit precedent, whenever parties form a valid and enforceable delegation agreement, the Federal Arbitration Act compels

courts to send the entire action to arbitration. *Bossé v. N.Y. Life Ins. Co.*, 992 F.3d 20, 27, at \*27, n.7 (1st Cir. 2021). Specifically, "where the parties 'by clear and unmistakable evidence' delegate issues of arbitrability to the arbitrator, 'the courts must respect the parties' decision as embodied in the contract' and send the issue to the arbitrator to decide." *Id*. (quoting *Henry Schein*, 586 U.S. at 65).

Here, the Arbitration Agreement provides precisely this "clear and unmistakable" evidence of the parties' intent to delegate threshold questions to the arbitrator. Section 2 of the Terms of Use, which Plaintiff affirmatively accepted, explicitly dictates: "All issues are for the arbitrator to decide, including, without limitation, issues relating to the applicability and enforceability of this arbitration agreement." Exhibit B; Contois Decl. at ¶ 19. This language is absolute and unequivocal. It leaves no room for ambiguity. The parties expressly agreed that an arbitrator, rather than a judge, must resolve any disputes regarding whether the Arbitration Agreement is valid, applicable, or enforceable against the Plaintiff.

Furthermore, the Arbitration Agreement expressly incorporates the rules of the American Arbitration Association ("AAA"). Exhibit B. And the incorporation of AAA rules—which explicitly empower the arbitrator to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement—constitutes independent, clear, and unmistakable evidence that the parties agreed to delegate arbitrability. *Toth*, 118 F.4th at 414. Thus, because the delegation clause is valid, binding, and unambiguously clear, this Court's inquiry must end here. By the express terms of the contract Plaintiff accepted, those issues are strictly reserved for the arbitrator. Therefore, Plaintiff agreed to submit questions of arbitrability, including questions regarding the validity of the agreement to arbitrate, to the arbitrator.

### 3. Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement.

Notwithstanding the valid delegation clause—which exclusively reserves this determination for the arbitrator—there can be no serious dispute that the Arbitration Agreement covers all of

14

Plaintiff's TCPA claims. In evaluating the scope of valid and enforceable arbitration agreements, federal policy dictates that courts should strongly favor compelling arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995). The Federal Arbitration Act reflects "a liberal federal policy favoring arbitration." *Schwartz*, 2026 WL 161514 at *2 (quoting *AT&T Mobility*, 563 U.S. at 339).

An arbitration clause is considered "broad" if it covers all disputes arising out of or relating to a contract, as opposed to a "narrow" clause that covers only specific types of disputes. Under a broad arbitration provision like the one at issue here, a presumption of arbitrability applies, and "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986). Under First Circuit precedent, a party seeking to compel arbitration must demonstrate that "the claim asserted comes within the clause's scope." *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 293 (D. Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019) (quoting *Soto–Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir.2011)).

The Arbitration Agreement Plaintiff accepted is undeniably broad. It explicitly mandates arbitration for "any dispute or claim that has or may arise between us, which arises out of or relates in any way to these Terms or your use of the Site or the Content." Exhibit B; Contois Decl. at ¶ 19. The "Terms of Use" goes even further to ensure total coverage, including that the agreement to arbitrate "is intended to be broadly interpreted" and expressly includes "claims arising out of or relating to any aspect of your relationship with us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." Exhibit B; Contois Decl. at ¶ 19.

Plaintiff's statutory TCPA claims may turn on whether he consented to be contacted at the telephone number he provided. Without admitting any liability for the alleged calls at issue, the only way EverQuote could have obtained Plaintiff's number is precisely because Plaintiff entered his

information on the Website and clicked the "Get My Quotes" button. Contois Decl. at ¶ 17. By taking

that action, the disclosure on the Website establishes that Plaintiff explicitly granted his "express

written consent... to being contacted by telephone (via call and/or text) for marketing/telemarketing

purposes at the phone number I provided in this form..." *Id*. at ¶ 14.

Therefore, Plaintiff's purported TCPA claims arise directly from his use of the Website and

the express consent he provided as contemplated by the "Terms of Use." Because Plaintiff's claims

are indivisibly linked to his interactions with the Website and fall squarely within the expressly broad

statutory scope of the Arbitration Agreement, the presumption of arbitrability clearly applies. "When

an enforceable arbitration agreement exists between the parties, a court may enforce that agreement

by staying existing litigation pending arbitration, 9 U.S.C. § 3, or compelling the parties to arbitrate

and dismissing the action, 9 U.S.C. § 4." *Bekele*, 199 F. Supp. 3d at 293 (citation omitted).

Accordingly, the Court must enforce the agreement as written, compel arbitration, and

dismiss or stay this proceeding.

**B.** **Arbitration is Required to Proceed on an Individual Basis, and Plaintiff's Class Claims Must be Dismissed or This Case Must Be Stayed.**

The Supreme Court has held that parties are "generally free to structure their arbitration

agreements as they see fit" and may: 1) "agree to limit the issues they choose to arbitrate," 2) "may

agree on rules under which any arbitration will proceed," 3) "may choose who will resolve specific

disputes," and 4) "may specify *with whom* they choose to arbitrate their disputes." *Stolt-Nielsen S.A.*,

559 U.S. at 683 (emphasis added in original) (internal quotation marks and citations omitted). As a

result, "a party may not be compelled under the FAA to submit to class arbitration unless there is a

contractual basis for concluding that the party ***agreed to do so***." *Id.* at 684 (emphasis added). "Courts

may not infer from an ambiguous agreement that parties have consented to arbitrate on a classwide

basis." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019).

"Supreme Court precedent establishes that class action and class arbitration waivers are

generally enforceable." *Christensen v. Barclays Bank Delaware*, No. 1:18-CV-12280-ADB, 2019 WL 1921710, at *6 (D. Mass. Apr. 30, 2019) (citing *American Express Co.*, 570 U.S. at 235-36 (holding waiver of class arbitration enforceable under the FAA); *AT&T Mobility*, 563 U.S. at 344 (invalidating a law conditioning enforcement of arbitration on the availability of class procedure because that law "interfere[d] with fundamental attributes of arbitration")).

In this case, the Arbitration Agreement leaves absolutely no room for inference or ambiguity. Although Plaintiff attempts to bring this action on behalf of a putative class, the "Terms of Use" he accepted explicitly foreclose classwide proceedings. Section 2 of the "Terms of Use" unequivocally mandates that "arbitration of disputes pursuant to this Section 2 shall be in your individual capacity" and contains a strict, capitalized Class Action Waiver: "THE ARBITRATOR MAY NOT CONSOLIDATE, COMBINE, OR JOIN THE CLAIMS OF OTHER PARTIES WHO MAY BE SIMILARLY SITUATED OR OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING," Exhibit B; Contois Decl. at ¶ 19. By clicking "Get My Quotes" and agreeing to these terms, Plaintiff expressly waived any right to participate in a class action or to have his claims heard on a representative basis. Consequently, Plaintiff cannot manufacture a class action here and must be compelled to pursue his claims solely on an individual basis.

As such, staying the case pending the outcome of individual arbitration, or alternatively, dismissal of the matter, is the legally mandated and most effective path forward. "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see also Schwartz*, 2026 WL 161514 at *7. Furthermore, courts in this district routinely note that if an arbitrator subsequently determines the claims are arbitrable, the Court will dismiss the action without prejudice. *Fairfield v. DCD Auto. Holdings, Inc.*, No. 22-CV-11977-DJC,

17

2023 WL 4186191, at *4 (D. Mass. June 26, 2023).

Therefore, EverQuote respectfully requests that this Court dismiss Plaintiff's class claims, compel Plaintiff to submit his individual claims to arbitration, and dismiss or stay the remainder of this action.

**C.    EverQuote Demands a Jury Trial on Arbitrability if the Court Determines There is a Disputed Fact Issue.**

EverQuote has presented evidence that the parties entered into a valid and enforceable arbitration agreement covering Plaintiff's claims in this case. If the Court nonetheless determines that there is a disputed issue of fact as to Plaintiff's agreement to arbitrate his claims, EverQuote demands a jury trial on the issue pursuant to Section 4 of the FAA. *See* 9 U.S.C. § 4 ("If the jury find that an agreement for arbitration was made in writing . . . the court shall make an order summarily directing the parties to proceed with arbitration in accordance with the terms thereof.").

**V.    CONCLUSION**

For the foregoing reasons, EverQuote respectfully requests the Court compel the arbitration of Plaintiff's claims.

Dated: March 23, 2026                          Respectfully submitted,

                                               */s/ Christopher B. Parkerson*
                                               Christopher B. Parkerson, (BBO#662952)
                                               Campbell Conroy & O'Neil, P.C.
                                               20 City Square, Suite 300
                                               Boston, MA 02129
                                               Telephone: (617) 241-3075
                                               cparkerson@campbell-trial-lawyers.com

                                               AND

                                               Eric J. Troutman (*pro hac vice*)
                                               Tori L. Guidry (*pro hac vice*)
                                               400 Spectrum Center Drive
                                               Suite 1550
                                               Irvine, CA 92618
                                               Telephone: (949) 350-3663
                                               Facsimile:(949)203-8689

tori@troutmanamin.com

*Counsel for Defendant EverQuote, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 23, 2026, a copy of the foregoing was filed electronically and served by other electronic means on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by e-mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Christopher B. Parkerson*
Christopher B. Parkerson