**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LEON WEINGRAD,** individually and on behalf of all others similarly situated, | Case No. 1:26-cv-10197 |
| *Plaintiff*, | |
| *v.* | |
| **EVERQUOTE, INC.** | |
| *Defendant.* | |

**PLAINTIFF'S OPPOSITION TO THE
DEFENDANT'S MOTION TO STRIKE THE CLASS ALLEGATIONS**

**Introduction**

Defendant's Motion to Strike is a premature attempt to short-circuit this case before any discovery has taken place. Courts in this District have repeatedly recognized that striking class allegations at the pleading stage is a drastic remedy reserved only for those rare cases where it is clear from the face of the complaint that certification is impossible as a matter of law. This is not such a case.

Plaintiff asserts a straightforward TCPA claim based on Defendant's uniform practice of placing telemarketing calls to numbers listed on the National Do Not Call Registry. The proposed class definition tracks the statutory elements and identifies a group of individuals whose claims rise and fall based on common proof—namely, whether Defendant made more than one telemarketing call to numbers listed on the Registry without consent.

Defendant's motion does not identify any defect that renders certification impossible. Instead, it raises merits arguments and individualized defenses—such as consent, established business relationships, and call content—that are routinely addressed at the class certification stage, not on a Rule 12(f) motion. Defendant's arguments depend on facts outside the pleadings and assume factual disputes that must be resolved through discovery.

**Background**

Plaintiff brings this action to enforce the TCPA's protections against unwanted telemarketing calls. As alleged in the Complaint, Plaintiff is a residential telephone subscriber whose number has been listed on the National Do Not Call Registry since April 3, 2019. *See* ECF No. 1 ¶ 19.

1

Plaintiff never provided prior express consent to receive telemarketing calls from Defendant and has never been a customer of Defendant. *Id.* ¶¶ 14, 20. Despite this, Defendant initiated multiple telemarketing calls to Plaintiff's residential telephone number. *Id.* ¶ 21.

Specifically, on January 14, 2026, Plaintiff received at least three telemarketing calls from Defendant originating from the same telephone number. *Id.* ¶¶ 21–22. The first call was missed. *Id.* ¶ 23. The second call connected, during which a caller identifying herself as "Jenny" from "EverQuote" attempted to provide an auto insurance quote before the call abruptly disconnected. *Id.* ¶ 24. The third call again connected, and Plaintiff expressly told the caller to stop calling. *Id.* ¶ 25.

Plaintiff brings this action on behalf of himself and a putative class defined as follows:

> **National DNC Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call or text message from or on behalf of Defendant encouraging the purchase of Defendant's goods or services, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

*Id.* ¶ 33.

## Argument

I.    **The Court Should Deny the Request to Strike Class Allegations Because Rule 12(f) Striking is Disfavored, and Class Certification Questions Should be Addressed on a Developed Record.**

Rule 12(f) provides that the court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," either on its own or on motion made by a party before responding to the pleading, such as the Complaint, as here. FED. R. CIV. P. 12(f), (f)(2). However, the Rule 12(f) device is used rarely and is particularly disfavored, applying, by its very definition, to "redundant, immaterial, impertinent, or scandalous matter." Indeed, counsel for the Plaintiff has identified only a handful of cases addressing the Rule 12(f) device in

the context of striking class allegations in this district and Circuit. The standard adopted in these cases is, as Defendant concedes, akin to that under Rule 12(b)(6), permitting striking class allegations only in cases where court is convinced that "any questions of law are clear and not in dispute" and that "no set of circumstances" put forth at the pleadings stage would permit a class to be certified on the basis set forth in the complaint. *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 575–76 (M.D. Tenn. 2020) (collecting cases).

As Judge Easterbrook wrote: "Class certification is normal in litigation under [the TCPA], because the main questions . . . are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *accord Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019) ("Given the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition.").

Indeed, recently Judge Sorokin certified this same type of TCPA class action in *Mantha v. Quotewizard.Com, LLC*, 347 F.R.D. 376 (D. MA. 2024), holding, "The private right of action in § 227(c)(5) offers many advantages for class-wide adjudication… The liability determinations involve no questions of individual reliance… no complicated contractual obligations… and no theories of probabilistic injury… Put simply, a plaintiff suing under § 227(c)(5) is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim" *quoting Krakauer v. Dish Network, LLC*, 925 F.3d 643, 648 (4th Cir. 2019).

Significantly, because "the TCPA is 'a consumer protection statute which is remedial in nature,' this Court must interpret the statute broadly" and certainly not allow it to be turned on its head and weaponized against consumers." *Heard v. Nationstar Mortg. LLC*, No. 16-cv-00694-MHH, 2018 WL 4028116, at *5 (N.D. Ala. Aug. 23, 2018). A class is not fail-safe if "[m]embership … can be determined without reaching any legal conclusions to determine whether

3

someone is in the class, one simply needs to answer questions … determined by objective criteria."
*Panacci v. A1 Solar Power, Inc.*, No. 15-cv-00532-JCS, 2015 WL 3750112, at *8 (N.D. Cal. June 15, 2015). Contrary to what Defendant argues, to determine class membership in this case, the Court will ask the following series of objective, factual questions:

- Did Defendant place marketing calls?

- Were those numbers that received the calls on the National Do Not Call Registry?

- Were those numbers assigned to residential telephone numbers?

- Does Defendant claim to have obtained consent to call them in the same manner Defendant claims to have obtained consent to call Plaintiff?

*See id*. at *8-9 (finding that the plaintiff's proposed Class were not fail safe because "one simply needs to answer questions such as whether the person received a certain number of phone calls from Defendants within a certain timeframe").

In fact, when the Defendant has not met its burden of demonstrating consent applicable to the class, a class is properly *certified*, not stricken. *See*, *e.g*, *Watson v. Manhattan Luxury Automobiles, Inc.*, No. 20 CIV. 4572 (LGS), 2022 WL 4586407, at *5 (S.D.N.Y. Sept. 29, 2022). Defendant's argument focuses on a potential affirmative defense of consent or an established business relationship (of which it has produced no evidence to support) to assert that this action in its entirety is incapable of being maintained as a class action. In rejecting the same argument raised in another TCPA case, another court *in this district* held exactly this:

> The Court finds that the defendant's motion to strike the class allegations is premature before plaintiff can develop the factual record through discovery. Loan Depot's citation of consent as a potential affirmative defense is insufficient to warrant striking the putative class solely on the pleadings. The motion to strike class allegations will, therefore, be denied.

*Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 318 (D. Mass. 2020).

4

**II.    There is no Requirement in the TCPA that Individuals Personally Register their Telephone Number on the Do Not Call Registry to have a Claim.**

The provisions of the TCPA do not require that one *personally register* their number on the Do Not Call Registry because that fact would be *impossible to prove*, as the FTC is neither authorized to nor collects such information. For that matter, such a holding would also run afoul of the 2003 TCPA Order, which explicitly noted that "the only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number. *This is the minimum amount of information that can be provided* to implement the national registry." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14037 (emphasis added). Registering a telephone number on the Registry does not require the provision of any personally identifiable information, and requiring such information would defeat the purposes of registration, consumer privacy. Thus, as an initial matter, the government is *not even authorized* to collect the information the Defendant claims the Plaintiff is required to prove as a legal matter. It follows that proving such information cannot be an element of a TCPA claim and as a result, cannot be a basis to strike class allegations prior to any discovery.

Relying on *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278, at *2 (N.D. Iowa June 9, 2022), the Defendant misstates the applicable law. The FCC's regulations permit a "residential telephone subscriber" to register "his or her telephone number" on the Registry. 47 C.F.R. § 64.1200(c)(2). Once a telephone number is registered on the Registry, the "registrations must be honored indefinitely, or until the registration is cancelled by the consumer of the telephone number is removed by the database administrator." *Id*. Previously, such registrations had to be renewed, but this hasn't been the case

since at least the mid-2000s. Therefore, in addition to requiring the government to collect information it isn't even legally authorized to collect, *Rombough* purports to require some TCPA plaintiffs to do the impossible–personally *re*register a number already on the Registry. It has been disagreed with by every other court to consider it and its premises. *See, e.g.*, *Watson*, No. 20 CIV. 4572 (LGS), 2022 WL 4586407, at *9 (S.D.N.Y. Sept. 29, 2022) (holding that "whether each class member registered their number on the NDNCR is irrelevant."); *Klassen v. Solid Quote LLC*, No. 23-CV-00318-GPG-NRN, 2023 WL 7544185, at *4 (D. Colo. Nov. 14, 2023); *D.G. v. William W. Siegel & Assocs.,* 791 F. Supp. 2d 622, 625 (N.D. Ill. 2011) ("Plaintiff is the regular user and carrier of the phone, Plaintiff qualifies as a "called party" under the TCPA."); *Olney v. Progressive Cas. Ins. Co.*, 993 F. Supp. 2d 1220, 1225 (S.D. Cal. 2014) ("Defendant seeks to arbitrarily limit standing to only the individual whose name appears on the bill. Notably, Defendant does not cite a single case to support this position. Further, this position has been rejected by other courts."). The Defendant also filed a motion to dismiss on this issue and the Plaintiff incorporates it by reference here. *See* ECF No. 25.

Nothing in the statute, regulations, or case law supports this loophole, and this Court should not create one.

### III.    The Potential Prescence of an Affirmative Defense is not a Basis to Strike Class Allegations.

Defendant's argument focuses on two affirmative defenses of consent or established business relationship (of which they've produced no evidence to support) to assert that the action in its entirety is incapable of being maintained as a class action.

Defendant's standard is inconsistent with the law of consent in TCPA matters such as this one. Courts around the nation have held that TCPA consent issues are not problematic from a

class certification perspective, particularly when there are potentially uniform issues with the offered consent evidence. *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 972 (N.D. Cal. 2019); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012); *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 504 (S.D.N.Y. 2014). Fortunately for consumers bombarded with illegal telemarketing calls, it is not enough for a telemarketer to allege consent, it must prove it. What's more, merely mentioning that discovery will reveal that one has an affirmative defense to some class members' claims is insufficient to strike class allegations, as appellate courts have ruled in other TCPA cases. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016) (holding that "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)" and that "allowing such speculation to dictate the outcome of a class-certification decision would afford litigants in future cases wide latitude to inject frivolous issues to bolster or undermine a  finding of predominance").

Plaintiff's class is not overbroad merely because of a purported defense of consent to some potential class members under the TCPA. Even at the *class certification* stage, evidence of a defense as to some prospective class members does not render a class overbroad if the plaintiff demonstrates a means of ultimately excluding consumers that are subject to the defense from the class. *True Health Chiropractic, Inc. v. McKesson Corp.,* 896 F.3d 923, 932-33 (9th Cir. 2018) (9th Cir. 2018) (predominance satisfied in TCPA case where "the record shows . . . little or no variation" in the forms used to obtain consent). Moreover, discovery can be used to identify which telephone numbers that were called had provided consent and any other class member identification issues. *See, e.g., Mey v. Frontier Communications Corp.*, No. 13-cv-01191-MPS, slip op. (ECF 102) (D. Ct. 2015); *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 329

(W.D. Okla. 2018). Indeed, the First Circuit has made clear that when a Court performs the predominance inquiry, it "must not rely on mere speculation that individual issues may arise." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021).

> As another Court held in a TCPA case late last year:

> it is not impossible to certify a TCPA class with a definition that does not expressly exclude telecommunication recipients who "solicited or consented to receiving the challenged" communications. *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1123-26 (6th Cir. 2016). Indeed, discovery could reveal "a class-wide absence of consent," *id.* at 1125, which would ultimately moot Defendant's consent concerns. In other words, further "factual development" could alter the certification analysis, which counsels heavily against striking Plaintiff's class allegations at the pleading stage.

*Hubble v. LoanDepot.Com, LLC*, 2025 U.S. Dist. LEXIS 186864, *8-9 (E.D. Mich. Sep. 23, 2025). Plaintiff's proposed class definition is also not a "fail-safe" class. A fail-safe class is one that defines membership by reference to the ultimate merits of liability—for example, limiting the class to "those who received unlawful calls without consent." The Plaintiff made a conscious decision to not include language about individuals who have not provided their "prior express written consent" in the class definition, as other federal courts *have found that* to be an impermissible fail-safe class in TCPA cases. Nor does the determination of the consent issue necessitate thousands of individual mini-trials as the Defendant claims. Courts do not see consent issues as problematic from a class certification perspective, particularly when there are uniform issues with the offered consent evidence. *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 972 (N.D. Cal. 2019), *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 504 (S.D.N.Y. 2014).

The cases Defendant relies on to argue that individualized consent issues *may* provide a basis to deny class certification were largely all decided on a full evidentiary record at class certification, not at the pleadings stage. *See e.g. Jamison v. First Credit Servs.,* No. 12 C 4415, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013) (denying certification of TCPA class after

8

discovery). The *TD Bank* and *Warnick* cases cited by the Defendant on this point are thus distinguishable. In *TD Bank*, the case revolved around issues of what individuals may have called to *revoke* consent and whether or not each consumer's method of revocation was "reasonable." *Martinez v. TD Bank USA, N.A.*, No. CV 15-7712(JBS/AMD), 2017 WL 2829601, at *5 (D.N.J. June 30, 2017). In *TD Bank*, the plaintiff also happened to adopt a flawed class definition predicated on whether the defendant had the plaintiff's "prior express consent." *Id.* at *12.

Defendant's consent argument is premature because it depends on speculation about defenses that may or may not exist and that, if they do exist, may or may not present individualized issues. Nothing on the face of the Complaint establishes that consent must be resolved through person-by-person mini-trials, or that Defendant's asserted affirmative defenses render the proposed classes incapable of certification. Indeed, the opposite may prove true. Discovery may reveal that Defendants relied on centralized records, uniform lead-generation sources, standardized web forms, common scripts, or consistent telemarketing procedures such that the existence or non-existence of consent can be assessed through common proof. It may also reveal that Defendants lacked compliant consent records altogether. At this stage, however, the Court does not know, because no class discovery has occurred. That is precisely why courts have repeatedly held that speculation about possible consent by some putative class members is not a basis to strike TCPA class allegations on the pleadings. *See Ott v. Mortg. Inv'rs Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046, 1065, 1067 (D. Or. 2014) ("Since the face of the [] Complaint does not reveal that [defendant] had express consent before it called cell phones, [defendant]'s speculation that some members of the Cell Phone Class may have given their express consent is not sufficient to strike that class action allegation for lack of standing . . . . This is not a matter that can be resolved from the face of the [] Complaint and, thus, is not a basis for striking those class allegations.").

Similarly, resolution of class certification will not require any impermissible merits determination. Defendant's argument that the class should be stricken merely because it references "telemarketing" is misplaced and reflects a misunderstanding of both Rule 23 and the TCPA.  Moreover, "telemarketing" is not a rigid or singular concept. It may encompass a range of communications depending on their purpose, content, and context, and courts have long recognized that whether a communication constitutes telemarketing is capable of classwide determination based on uniform evidence. The fact that the term may require interpretation or application to a set of facts does not transform it into an impermissible merits-based inquiry; virtually every Rule 23 class involves legal terms that overlap with the elements of a claim.

### IV.    No Court in Massachusetts has Ever Found that a Text Message is not a "Call" for Purposes of the TCPA.

A statute enacted in 1991 that prohibits "vehicles" in a park applies equally to sedans and Cybertrucks, even though Cybertrucks did not exist at the time. So too here. The TCPA authorizes the FCC to establish by regulation "a list of telephone numbers of residential subscribers who object to receiving telephone solicitations," 47 U.S.C. § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to phone numbers on that list, § 227(c)(3)(F). For decades, Courts and the FCC have determined that it may prohibit unsolicited text messages, not just voice calls. *See* 47 C.F.R. § 64.1200(e); 18 FCC Rcd. 14115; 38 FCC Rcd. 12247, 12256–57 (2023).

As a result, Everquote's motion makes a big ask. The Supreme Court recently held that courts are not automatically bound by the FCC's interpretations, and should make their own assessment of what the TCPA means. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). So Everquote sees a chance to swing for the fences: It asks this Court

10

to reject the FCC's longstanding interpretation and hold that the Do Not Call List protects only voice calls, potentially upending Do Not Call List protection for millions of communications every month.

Luckily for consumers nationwide, Everquote's arguments have been repeatedly rejected as most courts have found that telemarketing text messages fall within the statute's prohibition on "telephone solicitations."

The Supreme Court, every Circuit Court, and the majority of district courts, even after *McLaughlin* disagree with Defendant's position. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call'".). "The Supreme Court ratified the FCC's interpretation that a text message was a call for the purposes of the TCPA in *Campbell-Ewald v. Gomez* [.]" *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198 (D. Mass. 2021). Indeed, "it is unlikely that the Court would stay silent about any serious concerns that robotexts were an invalid ground for TCPA recovery in a case construing the same statute." *Id*. at 199. "Furthermore, … Justice Kavanaugh's plurality opinion in *Barr* cited the FCC's regulations applying the TCPA to text messages as the current applicable legal standard." *Id*. (citing *Barr v. American Ass'n of Political Consultants, Inc.*, 140 S.Ct. 2335, 2344 n.1, 207 L. Ed. 2d 784 (2020)). "The First, Second, Seventh, Ninth, and Eleventh Circuits have either adopted Judge Ginsburg's remark as black letter law rather than dicta or had already held that the TCPA included text messages before *Campbell-Ewald*." *Id*. at *6 (collecting cases).

Indeed, the only district courts within the First Circuit to address this issue has resolved it in the plaintiff's favor, *including the First Circuit Court of Appeals. See Breda v. Cellco Partnership,* 934 F.3d 1, n.1 (1st Cir. 2019) ("The TCPA also applies to other forms of communications, such as text messages"); *Mantha v. QuoteWizard.com, LLC,* 2020 U.S. Dist.

11

LEXIS 135257, 2020 WL 4369701 at *2 (D. Mass. Jul. 30, 2020) ("As the Court stated previously when dismissing the ATDS claim in the initial complaint, Plaintiff must plausibly allege that defendant (1) used an ATDS (2) to call (or text) a cellular telephone number."); *McDermet v. Trinity Heating and Air, Inc.*, 2018 U.S. Dist. LEXIS 22229, 2018 WL 84073 (D. Mass. Feb. 12, 2018) (not reported) (citing Ninth Circuit case law finding that "The FCC has reasonably interpreted call' under the TCPA to encompass both voice calls and text calls."); *Clough v. Revenue Frontier, LLC,* 2019 U.S. Dist. LEXIS 102436, 2019 WL 2527300 at *3 (D.N.H. Jun. 19, 2019).

This includes multiple decisions following *McLaughlin*. *See e.g. Jones v. Safr Techs., Inc.,* 793 F. Supp. 3d 362, 367 (D. MA. 2025) ("the TCPA regulates 'calls' and does not directly address the sending of text messages. However, the statute does contain provisions applicable to cellular telephones, and the First Circuit has previously held the statute "applies to other forms of communication, such as text messages."); *Novia v. Mobiz, Inc.,* 2026 U.S. Dist. LEXIS 55048 (D. MA. March 17, 2026).

"In addition to the Supreme Court and the FCC, *Congress* has also made clear the TCPA's applicability to text messages." *Williams v. Myler Disab., LLC*, No. 3:20-cv-00275-FDW-DCK, 2020 U.S. Dist. LEXIS 211914, at n. 2 (W.D.N.C. Nov. 12, 2020) (emphasis added) (citing *Pallone-Thune TRACED Act*, (the "TRACED Act") PL 116-105, December 30, 2019, 133 Stat 3274 (recognizing that text messages are covered in §227(b) in providing for streamlined information sharing with the FCC relating to "a call made or a text message sent in violation of subsection (b)"). Specifically, when Congress amended the TCPA in 2019 with the TRACED Act, it adopted the FCC's interpretation, instructing the FCC to prescribe regulations related to "a call made or *a text message* sent in violation of [227(b).]" 47 § 227(i)(1)(A) (emphasis supplied).

"Congress is presumed to be aware of an administrative or judicial interpretation of a

statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). "Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive." *Commodity Futures Trading Com v. Schor*, 478 U.S. 833, 846 (1986) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81 (1969); citing *Bell v. New Jersey*, 461 U.S. 773, 785, and n.12 (1983)). When Congress amended the TCPA in 2019, not only was it aware that the FCC and every court had interpreted the statute to cover text messages, it *ratified* that interpretation with an explicit reference to text messages in the amendment. Because Congress has spoken directly on the issue, the application of the TCPA to text messages is all but conclusive and reason alone to reject Defendant's position.

Most recently, a federal court rejected the identical argument advanced here and held that "§ 227(c)(5) applies to text messages sent to cellular phones." *Rabbitt v. Rohrman Midwest Motors, Inc.*, 2026 U.S. Dist. LEXIS 66266 *4 (N.D. Ill. 2026). As *Rabbitt* further explains, the supposed distinction between "telephone calls" and "telephone solicitations" does not support Defendant's position. The statute defines a "telephone solicitation" as "the initiation of a telephone call or message," confirming that text messages fall squarely within the conduct Congress sought to regulate. *Rabbitt v. Rohrman Midwest Motors, Inc.*, 2026 U.S. Dist. LEXIS 66266 *5 (N.D. Ill. 2026). Reading the statute in context, the court rejected the argument that the private right of action excludes texts, explaining that such a reading would "undercut Congress's otherwise coherent regulatory scheme." *Id.* 7–8.

Just recently, the Southern District of Texas addressed the same threshold question presented here—whether "telephone calls" under 47 U.S.C. § 227(c) encompass promotional text

13

messages sent to numbers listed on the National Do-Not-Call Registry—and answered it yes in *Alvarez v. Fiesta Nissan, Inc.,* 2026 U.S. Dist. LEXIS 1415 (S.D. Tex. Jan. 26, 2026). There, the court explained that the "true problem" is not statutory ambiguity, but the reality that "technology has done more to change [telephones] than [Congress] has done to change § 227(c)(5)." *Id.* at *8–9 (*quoting In re Erickson*, 815 F.2d 1090, 1092 (7th Cir. 1987) (Easterbrook, J.)).

Applying ordinary-meaning principles anchored to 1991 usage, *Alvarez* reasoned that the contemporaneous definition of "call"—"to get or try to get into communication by telephone"—is "capacious," and that sending a text message is plainly an effort "to get into communication by telephone." *Id.* at *9–10 (quoting *Webster's Ninth New Collegiate Dictionary* (1990)). And *Alvarez* rejected the defense premise that because modern speakers distinguish between "calls" and "texts," Congress must have excluded texts from the statutory term "telephone call," emphasizing that later-evolving linguistic conventions cannot narrow a statute's original scope: "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* at *12–13 (quoting *Yeskey*, 524 U.S. 206, 212 (1998)).

Finally, *Alvarez* tied the § 227(c)(5) cause of action to the rules it enforces—"the regulations prescribed under this subsection"—and to Congress's definition of "telephone solicitation" as the initiation of a "telephone call or message" to encourage a commercial transaction, concluding that "both the original text and the context" support reading § 227(c) to include text messages within its prohibition on violative "telephone calls" to numbers on the National Do-Not-Call List. *Id*. at *15–17. And the Court should reach the same conclusion here for the same reasons.

14

As further explained below, the word "call" in the TCPA encompasses text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA."). That interpretation follows from "the ordinary, contemporary, and common meaning of the verb 'to call.'" *Satterfield*, 569 F.3d at 953–54 & n.3. And even if the word "call" weren't enough, contemporary dictionary definitions of the word "message" emphasized that it encompassed "[a]ny notice, word, or communication, no matter the mode and no matter how sent." *Message*, *Black's Law Dictionary* (6th ed. 1990).[1] So a "message" can be spoken *or* written. More generally, the definition of "telephone solicitation" focuses not on a communication's form but whether it has a commercial purpose. *See, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493 (7th Cir. 2025). So, Congress presumably referred to "call or message" disjunctively in order to capture the broadest possible range of potential communication mediums. *See, e.g.*, *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). And "a voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *see Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. 2025).

Section 227(c) does not specifically use the words "text messages" or "SMS messages." That is unsurprising, because the TCPA was enacted in 1991, and the first-ever text message wasn't sent until 1992. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). But, as just explained, the statute *does* explicitly cover any "telephone solicitation," which is broadly defined to include any "call or message." 47 U.S.C. § 227(a)(4). "The fact that a statute

---

[1] *See also, e.g.*, *Message*, Webster's New Collegiate Dictionary (9th ed. 1991) ("a communication in writing, in speech, by signals"); *Message*, Oxford English Dictionary (2d ed. 1989) ("an oral or written communication sent from one person to another").

15

can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 550 (2d Cir. 2024).

Section 227(c)(5) authorizes suit when a person receives more than one "telephone call" in violation of "the regulations prescribed under this subsection." The regulations prescribed under § 227(c), however, prohibit initiating "telephone solicitations" to DNC-registered subscribers. 47 C.F.R. § 64.1200(c)(2). Congress defined "telephone solicitation" to include the initiation of a "telephone call or message." 47 U.S.C. § 227(a)(4). Thus, a telemarketing text message sent in violation of the DNC regulations necessarily triggers § 227(c)(5)'s private right of action.

Section 227(c)(5) grants a private right of action to enforce the Do Not Call List regulations to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" under § 227(c). *Krakauer v. Dish Network*, LLC, 925 F.3d 643, 650 (4th Cir. 2019). Accordingly, the FCC has recognized since 2003 that when the TCPA says "call," it means not just traditional voice calls but also modern text messages. 18 FCC Rcd. 14115 ¶ 165. And many courts have reached the same conclusion. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Satterfield*, 569 F.3d at 954 (holding "that a text message is a 'call' within the TCPA"); *Dawson v. Porch.com*, 2024 WL 4765159, at *4 (W.D. Wash. 2024) (collecting cases).

That meaning of "call" is especially clear in nearby provisions. Notably, there is only one other reference to "calls" in § 227(c), and it has the same breadth as "telephone solicitations." In § 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory

authority "to further restrict telephone solicitations, including those *calls* exempted under subsection (a)(3)" (emphasis added). In the original TCPA, subsection (a)(3) contained the statutory definition of "telephone solicitation." *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 3(a), 105 Stat. 2394, 2395 (1991). So § 227(c)(1)(D)'s reference to "calls exempted under" the definition of "telephone solicitation" necessarily mirrored that definition— which, as explained above, broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4).

Not surprisingly then, "District court decisions have largely held that § 227(c) applies to text messages" based "on statutory construction, not agency deference". *Wilson v. Better Mortg. Corp.*, 2025 U.S. Dist. LEXIS 251694, at *21 (S.D.N.Y. Dec. 5, 2025) (collecting cases).

The cases Everquote cites do not dictate a different conclusion. Everquote relies on *Jones v. Blackstone Medical Services, LLC*, 2025 WL 2042764 (C.D. Ill. 2025) and *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025), both courts found it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends there." *Davis*, 2025 WL 2491195, at *1.

But *Jones* and *Davis* are unpersuasive. There, the court decided that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was not an available technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Id.* at *4. But that is not the right way to interpret a statute. As the Supreme Court has cautioned—"modern intuition" doesn't always match "evidence of [a] term's meaning at the time of [a statute]'s adoption." *New Prime Inc.*, 586 U.S. at 114. When there's a mismatch, the original meaning of the text is what controls, not present-day usage. *See id.* at 114–16. So using the word "call" when one means "text" of course does sound

17

odd to 2026 ears; unlike, say, the word "emoji," that meaning of the word "call" hasn't come to be part of the modern text messaging lexicon. But *Jones* and other cases go astray when they reflexively apply those present-day intuitions about how text messages are discussed to language from 1991, before the first text message was ever sent.[2]

Even if the statute left room to doubt that a text message can be a violation (which it doesn't), the FCC's longstanding interpretation of the word "call" should still carry the day. Since 2003, the FCC held that text messages constitute calls within the meaning of the TCPA. *In Re Rules & Reguls. Implementing Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 (2003) (defining telemarking calls to "encompass[] both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls") (the "2003 Order"). In *Satterfield*, the Ninth Circuit found that the FCC's interpretation was reasonable and consistent with the dictionary's definition of "call," how text messages are sent and used, and the purposes of the TCPA. 569 F.3d at 954.

To be sure, mere ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412–13 (overruling *Chevron*). But courts still defer when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Id*. at 395.

This case falls at the intersection of *two* such express delegations. Mainly, § 227(c) itself

---

[2] *Compare, e.g.*, *Davis*, 2025 WL 2491195, at *1 (relying on how "a normal person refers to a text message"), *with* 47 U.S.C. § 227(b)(1)(A)(iii) (using the word "call" to refer to a message sent to a "paging service," the most analogous type of communication in 1991).

is an express delegation of rulemaking discretion to the FCC: Congress tasked the FCC with evaluating alternative approaches based on (among other things) their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). It then told the FCC to make rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphases added). That language grants discretionary authority to "fill up the details," accompanied by "flexibility" to determine what rules will best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395. Congress in 1993 asked the FCC to decide whether cell phone companies are "common carriers" whose subscribers have rights under the TCPA, and the FCC did. *Compare* 47 U.S.C. § 332(a)(1)(A), *with* 47 U.S.C. § 227(c)(3). That expressly delegated the FCC "authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 395. If Congress didn't speak on this issue, then it clearly looked to the FCC's expert judgment to supply an answer. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016) (express delegation was evidence that Congress expected telecommunications technology to evolve).

In any event, the FCC's interpretation is, at the very least, an "informed judgment" that should be accorded "great weight" by this court. *Loper Bright*, 603 U.S. at 388; *see Skidmore v. Swift Co.*, 323 U.S. 134, 139–40 (1944). The FCC's position is grounded in the agency's specialized expertise, consistent across decades, and well-reasoned. So, it has all the hallmarks of an agency decision with "the power to persuade." *Loper Bright*, 603 U.S. at 388.

**V.    If the Court grants any part of Defendant's Motion, it should grant Plaintiff leave to amend.**

19

Under Fed. R. Civ. P 15(A)(2) "a party may amend its pleading only with…the court's leave." "It is well established that amendments to pleadings should be freely allowed when the interests of justice so require." *United States v. United States Tr. Co.*, 106 F.R.D. 474, 476 (D. Mass. 1985) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 28 L. Ed. 2d 77, 91 S. Ct. 795 (1971); *Foman v. Davis*, 371 U.S. 178, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); *Farrell v. Hollingsworth*, 43 F.R.D. 362 (D.S.C. 1968)); *see also* Fed. R. Civ. P 15(A)(2) ("The court should freely give leave when justice so requires."). As the Supreme Court has stated, "[i]n the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be 'freely given.'" *Foman*, 371 U.S. at 182.

### Conclusion

Defendant has not met its heavy burden of showing that it is obvious from the face of the Complaint that this case cannot proceed on a classwide basis. Instead, Defendant raises premature arguments that depend on disputed facts and legal issues more appropriately addressed at the class certification stage.

For these reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Strike Class Allegations in its entirety.

Dated: March 29, 2026

<u>/s/ Anthony I. Paronich</u>
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com
*Counsel for the Plaintiff*

21