**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LEON WEINGRAD,** individually and on behalf of all others similarly situated,<br><br>  *Plaintiff*,<br><br>*v.*<br><br>**EVERQUOTE, INC.**<br><br>  *Defendant.* | Case No.<br>    1:26-cv-10197<br><br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT EVERQUOTE, INC.'S MOTION TO COMPEL ARBITRATION**

## I.    INTRODUCTION

Defendant EverQuote, Inc.'s ("EverQuote") motion to compel arbitration rests on a factual predicate that is demonstrably false, and, independently, on a contract that is unenforceable as a matter of law. The motion should be denied.

EverQuote says that, on January 14, 2026, Plaintiff Leon Weingrad ("Mr. Weingrad") visited its website, entered his telephone number and an email address ("sosking24@gmail.com") into a web form, read a dense block of disclosure text, and clicked an orange "Get My Quotes" button above that text.

There's only one major problem with that story, and it is that it is physically impossible.

On January 14, 2026, Mr. Weingrad spent the entire day sitting for an unrelated, full-day deposition, without internet access and without the opportunity to visit any website, let alone EverQuote's. (Weingrad Dec.) Mr. Weingrad does not own, use, or control the email address "sosking24@gmail.com," has never heard of it, and has never visited the website in his life. *Id*. He did not submit any information, did not see any disclosure, and did not agree to arbitrate anything. *Id.*

This is not the kind of case where the Court will even need to hold a summary arbitration trial because the evidence against EverQuote is so strong and what little evidence EverQuote adduces is so weak. Despite unequivocally and categorically contending that the Plaintiff visited its website, nowhere in its moving papers does EverQuote disclose any of the "evidence" it supposedly captured to prove that the Plaintiff himself visited the website. It omits the name associated with the submission, the time, IP address of the alleged visitor, the geolocation, the device type, the operating system, or any other purported information about the "submission" it

1

allegedly captured but does not even plead. A defendant with records actually linking Mr. Weingrad to a January 14 website visit would lead with them. EverQuote leads with silence.

Against EverQuote's bare recitation, Mr. Weingrad offers his sworn Declaration and an ironclad alibi. Courts routinely deny motions to compel arbitration on far weaker factual records. *See, e.g.*, *Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863, at *2 (M.D. Ga. Dec. 17, 2019) (denying motion where plaintiff proved an alibi rendering defendant's theory "impossible for him to access the website in the manner Defendant says he did"); *Conrad v. Camping World Holdings Inc.*, No. 4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025); *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545, at *3 (M.D. Tenn. Apr. 16, 2025). The Court should do the same here.

Beyond this threshold factual failure, EverQuote's motion fails for four additional independent legal reasons, any one of which requires denial. For these reasons, EverQuote's motion should be denied in its entirety. In the alternative, and if the Court concludes that a genuine dispute of fact remains despite Mr. Weingrad's deposition alibi, Plaintiff demands a jury trial on the formation issue as provided by 9 U.S.C. § 4.

## II.    BACKGROUND

This case involves illegal telemarketing calls made in plain violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227. Mr. Weingrad alleges that, in at least January 2026, EverQuote placed a series of marketing calls to his personal cellular telephone, a number on the National Do Not Call Registry for years, to solicit him for insurance. Mr. Weingrad brings this class action on behalf of himself and all similarly situated call recipients.

EverQuote, which earns revenue by selling insurance leads, seeks to avoid the merits of Plaintiff's claims by compelling arbitration based on a putative agreement allegedly formed on

2

EverQuote's own website. EverQuote's motion rests on the self-serving declaration of Madeline Contois, which asserts that EverQuote's "internal business records" allegedly "definitively establish" that on January 14, 2026, "Plaintiff" visited the Website, entered a phone number ending in 7476 and the email address "sosking24@gmail.com," and "clicked the 'Get My Quotes' button."

The Contois Declaration is conclusory hearsay, unsupported, and, in every respect that matters, wrong. EverQuote swears that it captures comprehensive "metadata" of each site visit. Yet the Contois Declaration produces none of it. The conspicuous absence of any metadata from EverQuote's moving papers, despite being within EverQuote's exclusive custody and control and despite EverQuote claiming it possesses it, is not an accident. It is a tell. Ms. Contois asks this Court to trust that EverQuote's "internal records" show what she says they show. That is precisely the kind of unsubstantiated assertion the FAA forbids.

Against EverQuote's empty recitation, Mr. Weingrad offers his sworn Declaration, attached hereto as Exhibit 1 ("Weingrad Dec."). The Declaration does far more than deny EverQuote's account. It renders it physically impossible. On January 14, 2026, the very day EverQuote claims Mr. Weingrad visited its website, read a long disclosure paragraph, and clicked "Get My Quotes," Mr. Weingrad was under oath, in an unrelated full-day deposition, without internet access. Counsel of record from that matter, the court reporter's transcript, and, if necessary, the other attorneys present can corroborate Mr. Weingrad's whereabouts.

Mr. Weingrad's Declaration also confirms that: (a) he has never visited the website; (b) he has never owned, used, or controlled the email address "sosking24@gmail.com," and does not know who does; (c) he never entered any information into EverQuote's Website; (d) he never clicked any "Get My Quotes" button on any EverQuote site; (e) he never saw any disclosure,

Terms of Use, or arbitration provision on any EverQuote site; (f) he did not authorize anyone to visit EverQuote's Website or submit his information on his behalf; and (g) he never agreed, and, having received calls that violated federal law, would never agree, to arbitrate his claims against EverQuote, nor to receive calls as an initial matter.

The screen EverQuote itself attaches to the Contois Declaration also tells its own story about the purported "clickwrap." A large, saturated orange "Get My Quotes" button sits at the top of the form. *Below* that button, in much smaller, unformatted grey text, sits an over ten line run-on paragraph that opens with "*By clicking* Get My Quotes and submitting this form . . . ." No checkbox anywhere on the page is required to indicate assent. The paragraph contains obvious typographical errors ("clickingGet My Quotes," "Terms of Use,including") that further obscure its meaning. The word "arbitration" appears exactly once, in the paragraph's penultimate sentence, inside the unspaced phrase "Terms of Use,including the arbitration provision." The arbitration agreement itself appears nowhere on the user facing page. It is reached only by clicking through to a separate hyperlinked document linked *below* the orange button.

### III.    LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, commands that, *before* compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing courts to compel arbitration only "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). Because arbitration is fundamentally "a matter of consent, not coercion,"

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010), consent remains a "first principle that underscores" arbitration. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019).

In evaluating the existence of an arbitration agreement, the First Circuit applies the summary judgment standard. *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 174 (1st Cir. 2021). "[T]he court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* at 175. Burden allocation under this standard is settled. The *moving party*, here, EverQuote, bears the initial burden of production and must affirmatively demonstrate "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Id.* Only *after* the moving party makes this threshold showing does the burden shift to the nonmoving party to "identify specific evidence in the record demonstrating a material factual dispute." *Id.* at 174 n.8. An "unequivocal denial" that the parties agreed to arbitrate, accompanied by supporting affidavits and evidence, is sufficient to require a jury determination on the formation issue, if not denial outright. *Dixon v. Michael Kors Retail, Inc.*, 468 F. Supp. 3d 409, 413 (D. Mass. 2020); *Santa Cruz v. Banco Santander Puerto Rico*, No. CIV. 08-1225 (JAF), 2008 WL 5192347, at *2 (D.P.R. Dec. 10, 2008); *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013).

The question of whether an agreement to arbitrate was ever formed in the first place is always for the Court, never an arbitrator, to decide, regardless of any delegation clause. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) (Where, as here, "a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge."). Before the Supreme Court definitively so held in *Coinbase*, the First Circuit made that rule explicit in *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 80 (1st

5

Cir. 2018), where the court drew "an important distinction between arguments challenging the validity of an agreement and those challenging an agreement's formation" and held that, when a party contests either formation or applicability, the court must resolve that disagreement.

Finally, if, after considering the record under the *Air-Con* standard, the Court concludes that a genuine factual dispute exists as to whether any agreement was formed, Section 4 of the FAA requires the Court to "proceed summarily" to trial of that question, with a right to a jury if demanded. 9 U.S.C. § 4; *Air-Con*, 21 F.4th at 175.

## IV.    ARGUMENT

### A.    Plaintiff's Declaration Forecloses Any Finding That a Contract Was Formed, and EverQuote's Motion Should Therefore Be Denied Outright.

As the party seeking to invoke arbitration, EverQuote bears the burden of demonstrating that Mr. Weingrad ever agreed to arbitrate. *Air-Con*, 21 F.4th at 175. It cannot come close to carrying that burden here.

Mr. Weingrad's Declaration does not merely deny EverQuote's account. It renders that account physically impossible. On January 14, 2026, the same day on which EverQuote claims Mr. Weingrad sat in front of its website, read a long disclosure paragraph replete with run-on sentences and grammatical errors, and clicked "Get My Quotes," Mr. Weingrad was elsewhere entirely. He was under oath, in a full-day deposition in an unrelated matter, without internet access, not visiting any website. For that matter, Mr. Weingrad further confirms that he has never owned, used, or controlled the email address "sosking24@gmail.com" that appears in EverQuote's records, and has no knowledge of who does.

Facing that record, EverQuote offers nothing but Ms. Contois's hearsay[1] assertion that its internal records "definitively establish" that "Plaintiff visited the Website." The records themselves are nowhere in the record. The "internal records" don't *even show the name* which was contended to have accessed the website. EverQuote cannot even identify the name EverQuote that was allegedly submitted on its website. None of the metadata or other information EverQuote claims it captured, such as the name, time, and IP address, appears in its motion. Every piece of data that could tether the "submission" to a specific human has been withheld. For that matter, the email address is not Plaintiff's. A defendant with data linking Mr. Weingrad to a January 14, 2026 website visit would lead with it. EverQuote leads with silence.

This case is, in every material respect, the same as *Hobbs*. In *Hobbs*, as here, a TCPA defendant sought to compel arbitration on the theory that the plaintiff had visited an insurance quote website. The plaintiff rebutted that theory by establishing that, at the time the defendant claimed he was entering information on a computer in Norcross, Georgia, he was actually driving between the Atlanta Zoo and Columbus, Georgia, making the defendant's account "impossible." Instead of granting an arbitration trial, the court denied arbitration outright:

> Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that it would have been impossible for him to access the website in the manner Defendant says he did. According to Plaintiff, at 3:57 p.m. on August 29, 2018, Plaintiff was driving from a job at the Atlanta Zoo in southeast Atlanta, Georgia to Columbus, Georgia (southwest of Atlanta) and thus could not have been in Norcross, Georgia (northeast of Atlanta). Plaintiff also presented evidence that he does not own a device that uses the Windows 7 operating system; he uses his cellular telephone for internet access. Finally, Plaintiff stated that he "cannot know for certain who accessed" Defendant's website and input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit www.bestautoinsurance.com." From this, a reasonable factfinder could determine that Plaintiff did not enter his personal information on Defendant's website or click "submit."

---

[1] Notably, although Ms. Contois invokes the business-records exception, she attaches *none of the underlying records*. Her summary of what those unproduced records purportedly show is inadmissible hearsay-within-hearsay entitled to no weight. Fed. R. Evid. 803(6), 1002; *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024)

So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus cannot conclude as a matter of law at this stage in the proceedings that the parties had a valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of arbitration (ECF No. 14) is denied.

*Id.* at \*2 (cleaned up).

Mr. Weingrad's alibi is stronger. In *Hobbs*, the plaintiff could only swear to and recreate his approximate whereabouts that afternoon. Here, Mr. Weingrad's whereabouts on January 14, 2026, are memorialized in the fact that he was in an all day deposition[2] that day. And, unlike the *Hobbs* defendant, EverQuote has not even bothered to produce the geolocation, IP address, operating system data, or even the alleged *name that was submitted*, that in *Hobbs* at least narrowed the factual question.

A parallel line of decisions reaches the same result on substantially weaker records. *See Conrad*, 2025 WL 66689, at \*2 (N.D. Ala. Jan. 9, 2025) (denying motion to compel); *Gilliam*, 2025 WL 1126545, at \*4 (denying motion to compel and ordering arbitration trial); *Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at \*3 (N.D. Ill. Sept. 20, 2024) (same). In each of those cases, the defendant offered *more than* what EverQuote offers here, only the plaintiff's telephone number and email address, and the respective courts either denied arbitration outright or ordered a summary arbitration trial. *A fortiori*, the record here warrants the same outcome. Mr. Weingrad has established an ironclad alibi, and EverQuote has produced even less corroborating metadata than in any of the aforementioned cases.

In the alternative, and only to the extent the Court concludes that a genuine factual dispute remains despite Mr. Weingrad's deposition alibi, Section 4 of the FAA requires that the

---

[2] The first call Plaintiff answered was mere minutes after the deposition had concluded, and the first call, which Plaintiff missed, occurred while he was still in deposition.

formation question be submitted to a jury. 9 U.S.C. § 4; *Air-Con*, 21 F.4th at 175. Plaintiff

hereby demands that jury trial to the extent one is required. However, the more economical

course, and the one the weight of authority supports, is to deny the motion outright on the papers,

given the complete lack of evidence under the summary judgment standard for the Defendant to

be able to compel arbitration.

**B.      Even Had Plaintiff Submitted Information to the Website, EverQuote's Agreement Is Unenforceable as a Matter of Law on Multiple Independent Grounds.**

Even assuming, *arguendo*, that Mr. Weingrad somehow clicked "Get My Quotes" on

January 14, 2026 (he did not), EverQuote's motion still fails for four independent legal reasons.

Each defeats arbitration standing alone. Together, they are overwhelming.

*1.   The Delegation Clause Does Not Foreclose Judicial Review Because Plaintiff Challenges Contract Formation Itself.*

Relying on the delegation clause embedded in its terms of use, EverQuote first argues

that all issues are for the arbitrator to decide. That argument is foreclosed by binding First Circuit

and Supreme Court authority. In *Toth v. Everly Well, Inc.*, 118 F.4th 403 (1st Cir. 2024), the First

Circuit held that when a party contests the formation of the contract, that is, whether any

agreement between the parties was ever concluded, the Court retains authority to resolve that

threshold question, even in the presence of a delegation clause. *Id.* at 409-13. As the court

explained, if an "agreement between the parties was not concluded," then neither was any

arbitration or delegation agreement within that contract. *Id.* at 409 (cleaned up) (addressing

checkbox). Here, Plaintiff challenges whether any valid agreement to arbitrate was formed, both

as a factual matter, because the Plaintiff never visited the website, and as a legal matter, since the

agreement does not meet the exacting standard for formation demanded under First Circuit law.

The First Circuit's decision in *Toth* is not an outlier. In *Coinbase*, the Court reaffirmed that where, as here, "a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." 602 U.S. at 151 (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)). The Court reaffirmed *Rent-A-Ctr.*'s central holding and went on to explain that "basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute." *Id.*; *accord Toth*, 118 F.4th at 409-10 ("a party may still challenge the contract's formation," which take the form of "formation and validity challenges."). That being the case here, with the Plaintiff challenging *both* the factual circumstances surrounding formation and the validity of the contract language as written as binding him, the Court retains, and must, decide these threshold questions in the first instance.

2. ***The Purported Agreement Is Unenforceable Browsewrap (or, At Best, a Hybrid Sign-In-Wrap) Because the Acceptance Language Sits Below the Action Button, with No Affirmative Manifestation of Assent.***

EverQuote repeatedly describes its online agreement as a "clickwrap." It is not. The label matters, because, under Massachusetts law, which applies when the issue here is one of formation as an initial matter, clickwraps, browsewraps, and the various in-between sign-in wraps and hybrids are treated very differently. *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1054 n.26 (Mass. 2021). "A 'browsewrap' agreement is an agreement where 'website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen.' . . . These agreements are often unenforceable because there is no assurance that the user was ever put on notice of the existence of the terms or the link to those terms. . . . [E]ven close proximity of the hyperlink to relevant buttons users must click on -- without more -- is insufficient to give

rise to constructive notice." *Id.* Clickwraps, which require a separate affirmative act, such as "checking a box," *id.* at 1050, are "regularly enforced" and are one of the "clearest manifestations of assent." *Id.* Browsewraps, on the other hand, are regularly refused enforcement because they typically involve no affirmative act of assent at all. *Id.* at 1054 n.26.

What EverQuote actually deployed on its website has none of the hallmarks of clickwrap. There is no separate "I Agree" button. There is no checkbox. There is no scrollwrap presentation of the Terms of Use. What there is, as the Contois Declaration's own screenshot shows, is a single large orange "Get My Quotes" button and under it a dense, unformatted, and grammatically inept grey disclosure paragraph sitting *beneath* that button. It also shows a lone, small blue hyperlink to "Terms of Use" tucked near the end of that paragraph, and nothing else. That is a browsewrap, or at best a modified sign-in wrap hybrid, not a clickwrap. *See Gaker v. Citizens Disability, LLC*, 654 F. Supp. 3d 66, 73 (D. Mass. 2023) (treating a similar below-the-button architecture as unenforceable and noting that clickwrap "requires that a user take an affirmative step to agree to the proposed terms . . . *separately* from merely clicking a "continue" or "submit" button"). On this point, this Court's decision in *Gaker* is particularly instructive:

> [T]he Court concludes that Citizens has not met its burden to establish that "a clear and conspicuous disclosure was provided and unambiguous consent was obtained." The terms indicating that users who submitted their information on the Super-Sweepstakes website consented to be contacted by the site's marketing partners were printed in small font at the very bottom of the page. The Court accorded significant weight to the fact that the terms appeared below the "CONFIRM YOUR ENTRY" button, such that a user could—and in all likelihood, would—click on the button without ever reaching the portion of the page disclosing the terms. Further, the terms were printed in smaller font than other language on the page, and appeared in blue font against a blue background, with only slight variation in color between the language and the background. Although the terms were legible to an ordinary reader, no other language on the Super-Sweepstakes site was presented so inconspicuously, and all promotional language appeared in colors that distinctly contrasted from the background.

*Id.* at 75-76 (cleaned up).

11

The difference is decisive. An online agreement is enforceable only if (1) the terms were reasonably communicated to the user, and (2) the user manifested assent to them. *See Kauders*, 159 N.E.3d at 1048-49. EverQuote's design fails both prongs. First, it fails on notice. The disclosure sits *below* the "Get My Quotes" button, the very action that EverQuote claims manifests assent. As in *Gaker*, a user who clicks the button to move on with the quote request has every reason to do so without ever scrolling to, or reading, the grey run-on paragraph of legalese positioned beneath it, let alone its links to the terms that appear at the bottom of a grammatically suspect paragraph. That is precisely the defect that First Circuit and Massachusetts courts have repeatedly held fatal to notice.

*Gaker's* reasoning is directly applicable to this case. EverQuote's disclosure is located below the action button. Its opening words, "*By clicking* Get My Quotes and submitting this form . . .," expressly contemplate that the user will not read the disclosure at all. The button is positioned *above* the relevant text, which makes it possible for a user to click "Get My Quotes" without even seeing any of the text at all. In such a way, the agreement thus tries to have it both ways, with the button being a purported point of assent, which is itself insufficient as a matter of binding Massachusetts law, and the language that would give the user notice of what he is assenting to is also positioned where he is unlikely to see it until after he has already clicked. That is not reasonable notice.

The Massachusetts Supreme Judicial Court reached the same conclusion in *Kauders*. There, the link to Uber's Terms and Conditions appeared "at the very bottom" of a screen, such that "the user could fully register for the service and click 'done' without ever clicking the link to the terms and conditions." 159 N.E.3d at 1052. Our very own State Supreme Court held the agreement unenforceable because there was no reasonable notice of the terms. *Id.* at 1054. The

EverQuote design does the same. A user can enter a phone number, email address, and any other information (which EverQuote does not even identify), click "Get My Quotes," and submit the form, without ever reading the disclosure paragraph, without ever clicking the hyperlinked "Terms of Use," and without ever seeing that it contains an arbitration provision.

EverQuote leans heavily on *Schwartz v. HelloFresh SE*, No. 1:25-CV-12222-JEK, 2026 WL 161514, at *1 (D. Mass. Jan. 21, 2026), but *Schwartz* cuts the other way. The court there enforced the agreement *precisely* because the user had to *affirmatively* activate a separate toggle switch coupled with the express language "By checking the box above, I agree to Factor's Terms and Conditions," an unambiguous, standalone act of assent distinct from the "Get My Quotes" button here. EverQuote offers no such separate act. The button *is* the submit button, the disclosure sits *below* it, and no checkbox, exists anywhere on the page, just as in *Gaker*.

District courts in TCPA actions across the country have almost uniformly rejected the sufficiency of such language, as has the Ninth Circuit. *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849 (9th Cir. 2022), is directly on point and applies the same principles this Court must apply under Massachusetts law. In *Berman*, the Ninth Circuit affirmed denial of a motion to compel arbitration where, as here, the consumer-facing form presented a large colored "Continue" button with small disclosure text beneath it. The court held that "conspicuousness" requires not only distinctive formatting but a presentation that "prominently display[s] . . . proposed contractual terms," and that burying contractual terms in small font underneath a brightly colored "continue" button fails that test. *Id.* at 857-58.  EverQuote's design is *worse* than the one in *Berman*. The EverQuote button is even more visually dominant, being in orange, the disclosure is in an even smaller, greyer font, the paragraph runs on for more than ten lines of

grammatically incoherent text, and the word "arbitration" appears exactly once, at the bottom of the paragraph, in a mangled sentence, "Terms of Use,including the arbitration provision."

The Northern District of Indiana applied the same framework in *Rojas v. GoSmith, Inc.* There, as here, the defendant labeled its form a "clickwrap," but, as here, the only "click" at issue was an action button ("See Job Matches"), whose text, as here, did not refer to agreement or assent ("Get My Quotes."). No. 2:17-CV-281-JVB-JEM, 2020 WL 831585, at *3 (N.D. Ind. Feb. 20, 2020). As the *Rojas* Court explained, "'See Job Matches' does not indicate assent or connect clicking the button to a contract's terms. Plaintiff, by clicking, only indicated that he wished to 'See Job Matches.' No text informed him that, by clicking the button, he was agreeing to a contract." *Id.* at *3. The court in *Rojas* not only rejected the characterization of this language as clickwrap, but also rejected defendant's argument that including purported terms *under* that button was sufficient. *Id.* at *4. ("On the evidence before the Court viewed in the light most favorable to Plaintiff, Plaintiff did not in any way interact with the part of the webpage regarding the arbitration agreement. His actions stopped with the "See Job Matches" button, which was above the arbitration agreement check box.").

*Second*, the agreement fails on assent. Even if this Court were to hold that EverQuote's placement of disclosure *below* the button satisfied the notice prong (and, as shown, it does not), the agreement still fails because EverQuote never secured any unambiguous manifestation of assent. The user clicks one button labeled "Get My Quotes." That language refers to the user's request for insurance quotes, not to an acceptance of legal terms. No checkbox is presented, nor is any agreement button presented. As indicated above, both *Berman* and *Rojas* determined that there was no assent because the button allegedly manifesting assent says something different

14

entirely. And although it may be permissible to satisfy the assent prong by making it clear to users that, by clicking a button, they are agreeing to certain terms, *Berman*, 30 F.4th at 857-58, EverQuote's design does no such thing. The action button says "Get My Quotes," not "I Agree." The text informing the user that clicking is an act of agreement sits *beneath* the button, where the user must arrive to read it, and by which time he has likely already clicked. As the *Rojas* court observed, clicking a button whose label does not refer to agreement "cannot be used to show that Plaintiff assented to the arbitration agreement." 2020 WL 831585, at *3.

EverQuote's design is exactly the kind of dark pattern design that courts have rejected as procedurally unconscionable and unenforceable. The disclosure's architecture, a ten-line run-on paragraph of legalese buried beneath the action button, riddled with grammatical errors, and mentioning "arbitration" at the end, exactly once in the mangled phrase "Terms of Use,including the arbitration provision" is a textbook dark pattern and procedurally unconscionable under Massachusetts law. *See Machado v. System4 LLC*, 28 N.E.3d 401, 414 (Mass. 2015) (procedural unconscionability turns on the "circumstances surrounding the formation of the contract," including surprising or obscured terms). Because EverQuote's design fails both prongs of the *Kauders* test, and given its striking similarity to terms this Court has already rejected in *Gaker*, no enforceable agreement to arbitrate was formed even if the Court credits (and it should not) EverQuote's claim that Mr. Weingrad was the person who filled out the form.

### 3. *The Scope of the Purported Arbitration Provision Does Not Extend to Plaintiff's TCPA Claims, Even Assuming,* **Arguendo,** *Plaintiff Visited The Website*

Even if a valid contract were formed (it was not) and even if its terms were sufficiently conspicuous (they are not), Plaintiff's TCPA claims fall outside the clause's plain scope. By its own terms, the arbitration clause reaches only disputes "aris[ing] out of or relat[ing] in any way to these Terms or your use of the Site or the Content." A TCPA claim for telemarketing calls

placed in violation of federal law is not a claim about the Website, the Terms, or the "Content."
It is an independent statutory claim for harms Congress defined long before EverQuote existed,
so it fails, even if assuming, *arguendo*, that Mr. Weingrad visited (which he did not).

Judge Kobick's decision in *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK,
2024 WL 1258501, at *6 (D. Mass. Mar. 25, 2024), is squarely on point. In *Starling*, a defendant
tried to use an arbitration clause in an internet services agreement to compel arbitration of a
TCPA claim. This Court rejected that sweeping view, reasoning that a "TCPA claim is not a
benefit of a contract for internet service; it is an independent cause of action created by Congress
in response to 'a torrent of vociferous consumer complaints about intrusive robocalls' that could
'automatically dial a telephone number and deliver an artificial or prerecorded voice message.'"
*Id.* The Court there rejected an attempt to take expansive boilerplate about the alleged
"beneficiaries of the service" and transform it into a way to shoehorn an independent statutory
claim into a contractual one about arbitration.

The same analysis applies here. Mr. Weingrad's allegations are not about his "use" of
EverQuote's website. Even assuming, *arguendo*, that he did (which is wrong), the arbitration
contract on face applies to a limited set of disputes: those relating to the use of the website or its
contents, not to TCPA claims. The claims at issue here are about EverQuote's decision to dial
Plaintiff's cell phone, despite his presence on the National Do Not Call Registry. That alleged
conduct, even if, *arguendo*, it were somehow traceable back to a submission on EverQuote's
website, does not "arise out of" or "relate to" the Terms of Use. It arises out of EverQuote's
independent obligations under federal law.

4. ***The Purported Consent Is Grammatically Incoherent Because The Pronoun "You"
Has No Identifiable Antecedent.***

16

There is one additional, independent defect with the disclosure text on which EverQuote's motion rests. As a matter of ordinary English grammar, it does not say what EverQuote now says it says. The disclosure reads, in relevant part:

> By clicking Get My Quotes and submitting this form, I am providing express written consent to being contacted by *you*, *EverQuote Marketing Partners*, or by one or more agents or brokers of *your* partners which companies I agree may reach me to discuss my interest, including offers of insurance . . . .

The sentence is written in the first person. "I" am giving my consent to be contacted by "you." The question is: *who is "you"*?

The pronoun has no identifiable antecedent. Nothing in the disclosure, or, indeed, anywhere on the user-facing page, precedes the word "you" with a proper noun identifying the addressee of the purported consent and agreement. The page never says "EverQuote, Inc." and never says "this website." The *only* candidate for an antecedent within the sentence itself is "EverQuote Marketing Partners", the phrase that appears immediately after the pronoun, set off by a comma. But "EverQuote Marketing Partners" is a link on EverQuote's website that lists only "EverQuote," not EverQuote's full legal name, alongside a list of hundreds of "marketing partners," including many nonsensical acronyms, which is problematic in its own right.

In any event, courts are not required to strain the rules of English grammar to save a commercial form from its drafter's carelessness. As Scalia and Garner explain, legal drafters "are presumed to be grammatical in their compositions"; courts therefore "rightly presume . . . that [they] understand subject-verb agreement, noun-pronoun concord, the difference between the nominative and accusative cases, and the principles of correct English word-choice." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012). The Grammar Canon provides that "[w]ords are to be given the meaning that proper grammar and usage would assign them." *Id.*

Applying that principle, EverQuote's reading fails in at least two independent ways.

*First*, under the Last-Antecedent Canon, "[a] pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent." *Id.* at 144. When there is a noun phrase close to the pronoun that could serve as its antecedent, courts apply that antecedent absent "some other indication of meaning" to the contrary. *Id.* at 146. Here, the only noun phrase near "you" is "EverQuote Marketing Partners." That phrase is set off by a comma immediately after the pronoun and appears nowhere else in the text. If "you" is read in the fashion its grammatical position most naturally supports, as a (pro)noun in apposition to "EverQuote Marketing Partners," then the consent runs to "EverQuote Marketing Partners," not to EverQuote, Inc. And though that links to a questionable hyperlink, by its plain terms, the word "partners" indicates someone *other than* EverQuote.

*Second*, an alternative reading, that the drafter of the form (presumably EverQuote, Inc.) is the silent referent of "you", is inconsistent with the rest of the sentence. The text goes on to refer to "one or more agents or brokers of *your* partners." The possessive "your" modifies a third party object ("partners") belonging to "you." If "you" is EverQuote, Inc., then "your partners" is EverQuote, Inc.'s partners, and "EverQuote Marketing Partners" (which already appears as a distinct entity in the same list) becomes doubly redundant, first as a (pro)noun in apposition for "you," then as a category subsumed within "your partners." The two readings cannot coexist grammatically. At best the text is ambiguous as to who is giving consent to whom.

The legal consequence of that ambiguity is that EverQuote cannot use it to compel arbitration. Ambiguous contractual language is construed against the drafter, here, EverQuote. And a drafter who asks a court to compel arbitration based on a document that cannot identify, in plain English, the party to whom the consumer is purportedly giving consent has not "clear[ly]

18

and unmistakab[ly]" established an agreement to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 939 (1995). What's more, as this Court has noted, any TCPA consent must identify the specific seller that consent is being provided to. *Mantha v. Quotewizard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919, at *8 (D. Mass. Dec. 13, 2021). A consent form that cannot grammatically identify its addressee cannot identify a specific "seller" either. *See id.* (holding disclosure deficient where it did not name the defendant as the seller). An arbitration clause tethered to a defective consent cannot reach a TCPA dispute about that very consent, to say nothing of the grammatical freight train that the rest of the disclosure consists of.

**C.      The Class Waiver Does Not Warrant Striking the Class Claims.**

EverQuote asks, in the alternative, that the Court strike Plaintiff's class claims based on the class action waiver nested inside Section 2 of the Terms of Use. That request rises or falls with the Motion to Compel Arbitration.

First, as Plaintiff has shown, no valid arbitration agreement was formed. If there was no contract, there was no class action waiver either. There is nothing to strike. Like an agreement to arbitrate, an agreement to forego the right to bring claims as a class action is contractually waivable, but if there is no contract in the first instance, there is nothing to agree to waive.

Second, even if the Court were to consider the class action waiver independently, EverQuote's own Terms of Use dictate the result. The terms themselves provide that if the class action waiver is deemed invalid or unenforceable (including if the entire contract is unenforceable, as it must be, for the reasons outlined above), then the entirety of this Section 2 shall be null and void. The severability consequence is therefore not the striking of Plaintiff's class allegations, but the complete unenforceability of Section 2, arbitration provision and all.

Third, and independently, the legal defects Plaintiff identifies here are *uniform* defects that apply equally to every class member EverQuote might attempt to bind to arbitration or the

putative class waiver. Whether EverQuote's below-the-button disclosure language provides reasonable notice under *Kauders*, whether the "Get My Quotes" button constitutes unambiguous manifestation of assent, and whether the grammatically incoherent "you" pronoun identifies any specific consenting counterparty, in addition to all of the other maladies identified here, are all common legal questions susceptible to uniform resolution on a classwide basis. Courts are virtually unanimous that when TCPA defenses rest on uniform defects, individualized determinations are not required and class treatment is appropriate. *See, e.g.*, *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 396 (D. Mass. 2024) (rejecting "individualized issues" argument based on TCPA consent and citing *Gaker*, 654 F. Supp. 3d at 71); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 568 (W.D. Wash. 2012) (same and collecting cases).

To the extent EverQuote takes issue with the class definition as pled, that complaint is premature and better suited to class certification. *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 318 (D. Mass. 2020) (denying motion to strike class allegations as premature). If any definitional issues remain at certification, the proper course is to permit amendment, not to strike the class allegations outright at the motion to compel stage.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant EverQuote, Inc.'s motion to compel arbitration in its entirety. In the alternative, and only to the extent the Court concludes that a genuine factual dispute remains as to contract formation despite Mr. Weingrad's deposition alibi, Plaintiff demands a jury trial on that narrow formation issue pursuant to 9 U.S.C. § 4.

Dated: April 20, 2026

<div style="margin-left:auto; width:50%;">

*/s/ Anthony I. Paronich*
Anthony I. Paronich, *Pro Hac Vice*
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com
*Counsel for Plaintiff*

</div>