UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEON WEINGRAD,

*Plaintiff,*

v.                                                        No. 26-cv-10197-MJJ

EVERQUOTE, INC.,

*Defendant.*

## MEMORANDUM AND ORDER

LEVENSON, U.S.M.J.

### INTRODUCTION

In this putative class action, Plaintiff Leon Weingrad ("Weingrad") alleges that

Defendant EverQuote, Inc. ("EverQuote") directed telemarketing calls to his phone number,

which was registered on the National Do Not Call Registry ("DNC Registry"). By doing so,

Weingrad claims, EverQuote violated the Telephone Consumer Protection Act, 47 U.S.C. § 227,

*et seq.* (the "TCPA"). Weingrad alleges that he received three calls from EverQuote, and he

seeks to represent a nationwide class of people who received similar calls from or on behalf of

EverQuote.

Before the Court are three motions from EverQuote: (1) a Motion to Compel Arbitration

(Docket No. 17); (2) a Motion to Strike Class Allegations (Docket No. 23); and (3) a Motion to

Stay Discovery (Docket No. 21).

For the reasons below, all three motions are denied. I address each in turn.

## I.      Background

In the Complaint, Weingrad alleges that on January 14, 2026, he received three telemarketing calls from EverQuote that he should not have received because his telephone number is registered on the DNC Registry.[1]

## II.      Motion to Compel Arbitration

Invoking the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), EverQuote has filed a motion to compel arbitration. Docket No. 17. I have considered EverQuote's supporting memorandum of law (Docket No. 18), and reply (Docket No. 45), as well as Weingrad's opposition (Docket No. 39).

### A.      *Standard of review*

When deciding a motion to compel arbitration, courts generally look to "the complaint and the record materials submitted in support of or opposition to the motion." *Air-Con, Inc. v. Daikin Applied Latin Am.*, LLC, 21 F.4th 168, 171 n.1 (1st Cir. 2021). "[D]istrict courts should apply the summary judgment standard to evaluate motions to compel arbitration under the FAA." *Id.* at 175. Accordingly, the Court "must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*; *see Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 168 (1st Cir. 2022).

### B.      *Legal Standard*

"It is well settled that 'arbitration is a matter of contract.'" *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). The "FAA compels judicial enforcement of a wide range of written arbitration

---

[1] The DNC Registry is created and maintained by the FCC, as directed by the TCPA. *See* 47 U.S.C. § 227(c)(3); 47 C.F.R. § 64.1200(c)(2).

agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). In relevant part, § 2 of the FAA provides that a "written provision in any ... contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

If there exists a contract that requires arbitration of a particular dispute, the Court must order arbitration. But "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). The FAA's bent toward arbitration "is only triggered when the parties actually agreed to arbitrate. It 'does not require parties to arbitrate when they have not agreed to do so.'" *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 207 (1st Cir. 2019) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)). Therefore, "[t]he court's first step in determining whether to compel arbitration is to identify a valid and enforceable agreement to arbitrate between the parties." *Air-Con*, 21 F.4th at 174.

"Courts apply state contract law to determine whether a valid arbitration agreement exists." *Id.* at 174 (citing *Rivera-Colón*, 913 F.3d at 207). "[A] district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). It is the party seeking to compel arbitration that bears the burden of demonstrating that a valid agreement to arbitrate exists. *See Air-Con,* 21 F.4th at 174; *Rivera-Colon*, 913 F.3d at 207.

### C.    *Background*

EverQuote operates a website—auto.everquote.com (the "Website")—where visitors enter personal information in order to receive automobile insurance quotes. Docket No. 18 at 1. When a visitor submits a request for insurance quotes, the data the visitor enters is captured and maintained in EverQuote's internal databases. Docket No. 18-1 ¶ 7. To have the quotes sent to them, users must click a bright orange button labeled "Get My Quotes." *Id.* ¶¶ 11, 13. Immediately beneath the button is a block of text with several hyperlinks. *Id.* ¶ 14. The text begins with "By clicking Get My Quotes and submitting this form, I am providing express written consent to being contacted by you, EverQuote Marketing Partners. . . ." *Id.* The last sentence of the text reads "By clickingGet My Quotes and submitting this form, I affirm that I have read and agree to this website's Privacy Policy and Terms of Use,including the arbitration provision and the E-SIGN Consent." *Id.* The words "Privacy Policy," "Terms of Use," and "E-SIGN Consent" are in blue text and underlined, and provide hyperlinks that direct users to the respective documents. *Id.* ¶¶ 16, 18.

Section 2 of the Terms of Use document contains an arbitration agreement that provides, "[y]ou agree to arbitrate all Claims between you and us, or any Provider, that cannot be amicably resolved in accordance with the foregoing paragraph." *Id.* ¶ 19.

### D.    *Analysis*

The threshold question here is one of contract formation: did Weingrad and EverQuote enter into the contract that EverQuote laid out on its website? To determine whether parties have formed a contract, Massachusetts courts apply a reasonableness test, "focusing on whether the contract provisions at issue 'were reasonably communicated and accepted.'" *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 571–72 (2021) (quoting *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 574 (2013), *aff'd*, 478 Mass. 169 (2017)).

Massachusetts courts regularly enforce contracts formed when a user affirmatively manifests assent to an online agreement by clicking or checking a box attesting that the user agrees to the terms and conditions. *Kauders*, 486 Mass. at 574. Such agreements are commonly referred to as "clickwrap" contracts. *Id.* On the other hand, "browserwrap" agreements, those with "website terms and conditions of use posted on the website as a hyperlink and the bottom of the screen" are often held to be unenforceable. *Id.* at 579 n.26.

I need not decide whether a user, clicking on the "Get My Quotes" button, would have created a binding contract with EverQuote, as EverQuote has not demonstrated that Weingrad clicked on the "Get My Quotes" button.

EverQuote insists that "Plaintiff entered into a valid contract with EverQuote that includes a mandatory arbitration provision." Docket No. 18 at 10. According to EverQuote, on January 14, 2024, someone visited EverQuote's website, and entered information, including Plaintiff's phone number, as well as the email address "sosking@gmail.com." *Id.* at 3. That person[2] clicked the orange button labeled "Get My Quotes," which caused a business record to be saved to EverQuote's internal database. *See id.* at 1–2; Docket No. 18-1 ¶ 17. Underneath the button was the text described above, which contained the statement "By clickingGet My Quotes and submitting this form, I affirm that I have read and agree to this website's Privacy Policy and Terms of Use,including the arbitration provision. . . ." *Id.* ¶ 14.

EverQuote's motion begins by describing an anonymous user ("a request for insurance quotes was submitted," "a user visited the Website") but switches, without explanation, to "Plaintiff". For example, "Plaintiff entered identifying information into the online form,

---

[2] EverQuote's declarant asserts that it was Plaintiff that entered his information and clicked the button. As discussed below, it is not apparent how the declarant is in a position to identify Plaintiff as the button clicker.

including the email address 'sosking24@gmail.com' and Plaintiff's exact phone number ending in 7476." Docket No. 18 at 1–3. What's missing is an explanation of how the Court should deduce that the user was indeed Plaintiff.

Likewise, the declaration of Madeline Contois begins with an explanation of what happens when "a consumer" visits the Website and then asserts that EverQuote's business records "definitively establish that on January 14, 2026, Plaintiff visited the Website and affirmatively requested auto insurance quotes." Docket No 18-1 ¶ 9. Contois' declaration does not elaborate on this assertion or provide any information to link EverQuote's business record to Weingrad; there is no indication that the person (or bot) that purportedly clicked the button was identified by a name, IP address, or other meta data. Eliding this glaring omission, the declaration advances to the dubious claim that "[w]ithout Plaintiff taking these specific actions, EverQuote's system would not have obtained his phone number or consent to be contacted." *Id.* ¶ 17.

The Contois declaration fails to acknowledge the obvious possibility that another individual could have entered Plaintiff's phone number, either as a typo or by purposely entering an incorrect phone number. Nor is there any discussion of the prospect that a bot or other program could have been tasked with entering phone numbers to the website. In any event, absent some persuasive factual showing that it was indeed Plaintiff who provided his telephone number and clicked the button in question, no binding contract would result.

For his part, Weingrad denies EverQuote's assertion that he agreed to the contract and its arbitration provision. Not only does he deny doing so, he offers an alibi. He asserts that he could not have entered his phone number into the webform because he was offline, tied up in an all-day deposition on January 14, 2026. Docket No. 39 at 7; Docket No. 39-1 ¶ 12. Underscoring his

contention that something is amiss, Weingrad also asserts that he has never used the email address that EverQuote reports was submitted with his phone number. Docket No. 39 at 7; Docket No. 39-1 ¶ 13.

Other than the bare fact that EverQuote somehow obtained Weingrad's phone number—hence the phone calls that Weingrad complains of—there is a dearth of information tying Weingrad to the business record that EverQuote relies on. That record seems to include Weingrad's phone number, but nothing else that would inferentially point to Weingrad as the source.

There is, in short, a genuine dispute of material fact as to whether Weingrad clicked on the EverQuote website and thereby entered into a binding arbitration agreement. EverQuote fails to carry its burden and the motion to compel arbitration must be denied.

### III.    Motion to Strike Class Allegations

Weingrad proposes the following class in his complaint:

**National DNC Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call or text message from or on behalf of Defendant encouraging the purchase of Defendant's goods or services, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

Docket No. 1 ¶ 33.

EverQuote moves to strike Weingrad's proposed class allegations. Docket No. 23. EverQuote asserts that Weingrad's putative class is uncertifiable because it is overbroad, its members lack commonality, and membership is impermissibly merits-based. Docket No. 24 at 1–2. EverQuote asks this Court to take the unusual step of striking class allegations based on the pleadings alone. *Id.* at 3–4. I have considered EverQuote's supporting memorandum of law (Docket No. 24), and reply (Docket No. 38), as well as Weingrad's opposition (Docket No. 26).

7

EverQuote asserts that Weingrad's putative class is overbroad and lacks commonality because it fails to exclude individuals from the class who (i) gave express consent to the marketing calls, (ii) did not—themselves—register their phone numbers on the DNC Registry, or (iii) received text messages instead of phone calls. Docket No. 24 at 1–2. EverQuote asks the Court to "exercise its authority to strike the class definition here and now, rather than subjecting the parties and the Court to the expense of valuable time and resources on discovery and other motions practice." *Id.* at 1.

Weingrad responds that it is "premature [to] attempt to short-circuit this case before any discovery has taken place." Docket No. 26 at 2.

### A.    *Legal Standard*

Certification of a class is governed by Federal Rule of Civil Procedure 23. *See Wal-Mart Stores, Inc., v. Dukes et al.*, 564 U.S. 338, 345 (2011). The party seeking certification must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Additionally, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b). Fed. R. Civ. P. 23(b).

If it is "obvious" from the pleadings that a particular collection of individuals cannot be certified as a class, a court may strike the class allegations under Federal Rule of Civil Procedure 12(f). *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013). Motions to strike prior

to discovery, however, are disfavored, and the First Circuit has advised district courts to "exercise caution when striking class action allegations based solely on the pleadings." *Id.*

### B.    Analysis

It is not obvious from the pleadings that Weingrad's proposed class will fail certification.

#### 1.    The Proposed Class is Not Overbroad

The bulk of EverQuote's motion focuses on its assertion that the proposed class is overbroad. Docket No. 24 at 4–13. EverQuote takes issue with the fact that the proposed class includes individuals who may have: (a) consented to receive calls or had an established business relationship with EverQuote; (b) not personally registered their phone numbers on the DNC Registry; or (c) only received text messages.

##### a.    Consent or Established Business Relationship

EverQuote argues that it makes calls only to individuals who have consented to receive calls—individuals who are seeking car insurance quotes—and that such individuals would be swept into Weingrad's class using the current definition. Docket No. 24 at 6. But the assertion that an individual consented to a call is an affirmative defense under the TCPA and as such does not warrant striking the putative class solely on the pleadings. *See Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 318 (D. Mass. 2020); *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) ("The fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012)). The prospect that EverQuote may assert an affirmative defense of consent is not fatal to Weingrad's proposed class at this stage. Indeed, the glaring gaps in EverQuote's initial showing with respect to Weingrad's purported entry into a clickwrap arbitration agreement (as discussed above) may signal that EverQuote's anticipated defense may be easier to plead than to prove.

b.        Personal Registration

EverQuote contends that individuals who have not personally registered their own numbers on the DNC Registry do not have standing under the TCPA. Docket No. 24 at 10. EverQuote argues that "the regulation's plain text expressly mandates personal registration" and that Weingrad's proposed class is overly broad because it improperly includes individuals who have not personally registered their telephone numbers. *Id.* at 8–11.

Contrary to EverQuote's assertions, most courts have interpreted the TCPA and its governing regulations as protecting a telephone *number* from unwanted calls, not just the particular individual who registered the telephone number. *See Kraemer v. USHealth Advisors, LLC*, No. 3:24-CV-275-DWD, 2024 WL 4880559, at *5 (S.D. Ill. Nov. 25, 2024) (refusing to dismiss plaintiff's TCPA claim although his telephone number was registered by a prior subscriber*)*; *Showers v. Pelican Inv. Holdings Grp*., LLC, 751 F. Supp. 3d 900, 911 (S.D. Ill. 2024) ("There is no requirement that an individual have *personally* registered the phone number." (emphasis in original)); *Moore v. Healthcare Sols. Inc.*, No. 21-CV-4919, 2022 WL 17487823, at *5 (N.D. Ill. Dec. 7, 2022) ("The focus is on whether the number was registered, not who did the registration."); *Nichols v. eHealthInsurance Servs., Inc.*, No. 23-CV-06720-EKL, 2025 WL 689721, at *3 (N.D. Cal. Mar. 3, 2025) ("the TCPA's protections attach to registered telephone numbers, regardless of whether the phone number is still used by the person who originally listed it in the NDNC Registry").

EverQuote relies heavily on the decision of the district court in *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278 (N.D. Iowa June 9, 2022). In that case, the court found that the plain language of Section 61.1200(c) means that a violation occurs only when a person or entity initiates a telephone solicitation to a residential telephone subscriber who has personally registered his or her telephone number on the national

DNC Registry. *See id*. at *2. That holding, however, has not been embraced by other courts. In fact, "most courts have resoundingly rejected the holding in *Rombough* as at odds with both the language and the purpose of the statute and implementing regulation." *Binetti vs. Colorado Tech. Univ., Inc.*, No. 6:25-CV-01049-AP, 2026 WL 812365, at *5 (D. Or. Jan. 21, 2026) (collecting cases).

I do not find *Rombough* persuasive. It is premature to rule on the face of the pleadings that Weingrad's proposed class definition cannot encompass individuals whose numbers are listed on the DNC Registry, regardless of whether they personally did the registering.

### c.      Text Messages

"A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156, (2016), *as revised* (Feb. 9, 2016); *Breda v. Cellco P'ship*, 934 F.3d 1, 4 n.1 (1st Cir. 2019) ("The TCPA also applies to other forms of communication, such as text messages."); *Mantha v. QuoteWizard.com, LLC*, No. 19-CV-12235-LTS, 2020 WL 4369701, at *2 (D. Mass. Jul. 30, 2020) ("As the Court stated previously when dismissing the ATDS claim in the initial complaint, Plaintiff must plausibly allege that defendant (1) used an ATDS (2) to call (or text) a cellular telephone number."); *McDermet v. Trinity Heating and Air, Inc*., No. 1:17-CV-10566, 2018 WL 840743, at *3 (D. Mass. Feb. 12, 2018) (quoting Ninth Circuit case law finding that the "FCC has reasonably interpreted 'call' under the TCPA to encompass both voice calls and text calls."); *Clough v. Revenue Frontier, LLC*, 1:17-CV-411-PB, 2019 WL 2527300, at *3 n.2 (D.N.H. Jun. 19, 2019) (citing Eleventh Circuit case law).

I find that the inclusion of text messages in Weingrad's proposed class definition does not render the class overly broad.

##### 2.    *Proposed Class Members Do Not Lack Commonality.*

The instant case has not yet reached the class certification stage and it is premature to speculate about whether Weingrad will ultimately make a sufficient showing of commonality. To reiterate: striking a portion of a pleading is "a drastic remedy." *Manning*, 725 F.3d at 59 (quoting 5C *Wright & Miller's Federal Practice & Procedure* § 1380 (3d ed. 2011)). Striking class allegations is particularly disfavored, as it "preemptively terminate[s] the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled." *Id.* (quoting *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012)).

At the risk of looking too far ahead, there are reasons to suppose that commonality may ultimately be found in Weingrad's favor. On the face of the Complaint, this case seems to have much in common with *Mantha v. QuoteWizard.com, LLC*, which also dealt with unwanted communications that were linked to an on-line insurance quotation service. 347 F.R.D. 376 (D. Mass. 2024). In *Mantha*, Judge Sorokin ruled that a putative class of individuals receiving unwanted telemarketing texts satisfied Federal Rule of Civil Procedure 23(a)(2)'s requirement of commonality because there were questions of law or fact common to the claims of all members of the putative class. *Id.* at 393. These included:

  • Were the phone numbers of all class members listed on the DNC Registry for the required amount of time at the time of the text campaign?

  • Were the texts received?

  • Were the texts sent to residential numbers?

  • Did class members receive two or more calls in a 12-month period?

  • Can QuoteWizard show that any class member provided their prior express consent signed in writing to receive the telemarketing texts at issue specifically from QuoteWizard itself?

• Do the purported internet-based "opt ins" offered by QuoteWizard as a proof of consent satisfy the E-Sign Act?

• Did QuoteWizard authorize [the telemarketing entity] to text class members on its behalf?

• Are class members entitled to recover statutory damages of up to $500 per violation of § 227(c)?

*Id.*

Outside of the TPCA context, courts have typically characterized the commonality requirement as a low bar and have given it a "permissive application." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir. 2008) (quoting 7A *Wright & Miller's Federal Practice & Procedure* § 1763, at 221 (3d ed. 2005)). Commonality is seen as a low bar because a "*single* common legal or factual issue can suffice." *Mantha*, 347 F.R.D. at 393 (quoting *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003)). EverQuote offers no convincing argument that there is in this case an absence of commonality so glaring as to warrant striking class allegations at the pleading stage.

### 3.      *Proposed Class Members Are Defined by Objective Criteria.*

EverQuote alleges that Weingrad's proposed class definition based upon the merits "assures that all members of a class have already won on a critical substantive issue," creating what is otherwise known as a "fail-safe" class. Docket No. 24 at 16; *see In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015) (defining a fail-safe class as "a class defined in terms of the legal injury"). Put differently, a fail-safe class admits only those members to whom the liability of the defendant is already established. *See Bais Yaakov of Spring Valley v. ACT, Inc.*, 328 F.R.D. 6, 13–14 (D. Mass. 2018). Such classes are impermissible because "they make it virtually impossible for the [d]efendant[ ] to ever 'win' the case, with the intended class preclusive effects, as any class member against whom [d]efendant succeeds is thereby excluded from the

class." *MSP Recovery Claims, Series LLC & Series 17-04-631 v. Plymouth Rock Assurance Corp., Inc.*, 404 F. Supp. 3d 470, 485 (D. Mass. 2019) (quoting *In re Nexium Antitrust Litig.*, 777 F.3d at 22 n.19) (citation modified).

Once again, we are still in the pleading stage. Class definitions that fall into the impermissible fail-safe category "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 468 (D. Mass. 2018) (quoting *St. Louis Heart Ctr., Inc. v. Forest Pharm., Inc.*, 2013 WL 1076540, at *6 (E.D. Mo. Mar. 13, 2013)). Judge Gorton of this Court has ruled that any contention at the pleading stage that a putative class of individuals filing a TCPA claim is a fail-safe class "is premature at best." *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38, 41 (D. Mass. 2022). By the same logic, I will deny EverQuote's motion to strike class allegations at this juncture; even if refinements may be required down the road, the class definition is not facially defective.

Accordingly, EverQuote's motion to strike class allegations is denied without prejudice.

## IV.    Motion to Stay Discovery

Having denied EverQuote's motion to compel arbitration and motion to strike class allegations and having provided a report and recommendation to deny EverQuote's motion to dismiss, I decline to stay discovery. *See Channing Bete Co., Inc. v. Greenberg*, No. 19-CV-30032-MGM, 2021 WL 4398510, at *2 (D. Mass. Sept. 27, 2021) ("[F]ederal courts possess the inherent power to stay proceedings for prudential reasons." (quoting *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (alteration in original)).

EverQuote's motion to stay discovery (Docket No. 21) is grounded in Everquote's assertion that this matter is subject to compulsory arbitration and/or that the class allegations of the Complaint should be stricken (Docket No. 22 at 1–2). I have considered EverQuote's

14

supporting memorandum of law (Docket No. 22), and reply (Docket No. 37), as well as Plaintiff's opposition (Docket No. 27).

Discovery motions are, of course, directed to the discretion of the Court. With the denial of EverQuote's other motions, there is no good reason to hold off starting the work of discovery.

CONCLUSION

For the forgoing reasons:

- EverQuote's motion to compel arbitration (Docket No. 17) is DENIED.

- EverQuote's motion to strike class allegations (Docket No. 23) is DENIED.

- EverQuote's motion to stay discovery (Docket No. 21) is DENIED.

So ordered. [3]

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: June 26, 2026

---

[3] The parties are advised that under Federal Rule of Civil Procedure 72(a) or Federal Rule of Criminal Procedure 59(a), and under Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party seeking review by a district judge of these determination(s) and order(s) must serve and file any objections within 14 days of receiving this order, unless a different time is prescribed by the magistrate judge or a district judge. Such objections must specifically designate the order, or part thereof, to be modified or set aside and the basis for objection. The district judge will set aside any portion of the magistrate judge's order that is found to be clearly erroneous or contrary to law. The parties are further advised that failing to follow the objection procedures of Rule 2(b) may preclude further appellate review. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999); *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964–65 (1st Cir. 1997).